Death Opinion














IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,924






RANDALL WAYNE MAYS, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM THE 392nd JUDICIAL DISTRICT COURT


HENDERSON COUNTY





 Cochran, J., delivered the opinion of the unanimous Court.



OPINION



 In May 2008, a jury convicted Randall Wayne Mays of capital murder for the shooting
death of Henderson County Deputy Sheriff Tony Ogburn. (1) Based on the jury's answers to
the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b)
and 2(e), the trial judge sentenced Mays to death. (2) After reviewing Mays's twenty-one points
of error on direct appeal, we conclude that they are without merit. Accordingly, we affirm
the trial court's judgment.

Factual and Procedural Background


 Appellant was charged with the capital murder of two sheriff's deputies and the
attempted capital murder of a third deputy, all stemming from a stand-off with police at his
rural property. This appeal is from appellant's trial for the first deputy's death.

 The evidence showed that at about 3:00 p.m. on May 17, 2007, Fran Nicholson called
the Henderson County 911 dispatcher and said that appellant, her neighbor, was shooting a
handgun at his wife, who was close to the road. Mrs. Nicholson was worried because the
school bus was about to drop off her granddaughter near where appellant was shooting. 
After the first shot, Mrs. Nicholson heard one or two more, and she saw appellant's wife,
Candis, walking down the easement. Candis and appellant were screaming at each other.

 Deputies Billy Jack Valentine, Duane Sanders, and Eric Ward responded to the
"domestic violence-gunshot" dispatch call. (3) All three were in uniform, wearing badges, and
driving marked patrol cars or trucks. Appellant's two-acre property was surrounded by pipe
fencing, (4) so Deputies Valentine and Sanders hopped over the fence to talk to the couple who
were still standing near the road. (5) Candis, who was described as being "slow," walked "right
up directly in [Deputy Sanders's] face." She was angry and said he had no business being
on their property. "We're just having a spat." Appellant, however, was calm, polite, and
friendly. He explained that Candis had been sexually assaulted and he was mad about it. Appellant told Deputy Valentine that he did not know who had called the police, but
he "guessed" that Candis had. Valentine assured appellant that he was just trying to do his
job and figure out what was going on, so he called dispatch to find out who had made the 911
call. When the dispatcher said that the call came from the neighbor, Fran Nicholson, 
Valentine sent Deputy Sanders over to the Nicholsons' house to find out why she had called. 
Just as he was leaving, Sanders saw Deputy Tony Ogburn arrive in his patrol car. Deputy
Ogburn was wearing his police uniform and hat. 

 In the meantime, Valentine asked appellant if he had a gun on him and whether he had
been shooting. Appellant said that he had been "target practicing," and that the gun was in
his house. Valentine also calmed Candis down, and appellant joked about how he "was
wanting to get some loving from her and that's what started this." Throughout, appellant
"was very nice, courteous"; he was "super-calm." However, Valentine also stated that
appellant was well known to the local deputies because "[h]e shoots a lot out there."

 Sanders radioed back that the Nicholsons wanted to press charges against appellant
for deadly conduct, so Valentine called dispatch to see if appellant had any felony
convictions or arrests. He did; "the most recent [arrest] was a 7/1/99 assault on a public
servant." Valentine said, "That was me, that was on me." (6) He then approached appellant to
arrest him and said, "Before you talk to me any more, OK, listen to me. Now don't make this
no harder than it's gonna be, OK? You have the right to remain silent- " At that moment,
appellant's face changed, and he started backing up.

 According to Fran Nicholson, who was watching from her front porch, appellant
"broke to run for the house." Valentine reached out to grab the back of appellant's T-shirt
to stop him from getting to the house where appellant had said he had weapons. Appellant's
T-shirt ripped, and he pulled a knife and ran in the front door with Valentine close behind. 
Appellant emerged a few seconds later "with the barrel of the rifle coming out." It was a
30.06 deer rifle with a scope. Valentine was about two and a half feet away, but appellant
did not shoot; instead, he yelled, "Back off, back off!" Appellant disappeared back inside
the house as Valentine screamed, "He's got a gun!" to warn the other officers. Valentine ran
back around the side of the house, took cover behind a truck, and kept talking to appellant
to calm him down, get him to put down the rifle, and come back outside. Valentine testified
that appellant pulled a chair up to a window, sat down, and kept talking to him. "We just
kept going back and forth, just different things." Even during the middle of the stand-off,
appellant "seemed to be fine mentally."

 Deputy Sanders had returned from the Nicholsons, and he took cover along with
Deputies Ward and Ogburn. More officers kept arriving and they, too, took up defensive
positions behind cars, trucks, and sheds. Appellant and Valentine intermittently yelled and
talked back and forth for more than fifteen minutes. (7) Meanwhile, Candis was wandering in
the open yard between the deputies and appellant, getting in the line of possible fire, saying
that the officers were not going to shoot her husband and he wouldn't shoot them. A deputy
finally tackled her and pulled her off behind a shed where he handcuffed her to keep her safe.
Other officers, including Deputy Ogburn, took turns talking to appellant.

 After about twenty minutes, appellant climbed out of a window without his rifle and
started forward toward the officers. As one deputy talked to appellant, keeping him calm,
Valentine tried to "slowly ease" between appellant and the open window to ensure that
appellant could not run back into the house where the guns were. Appellant saw him, turned,
and bolted back toward the window. Valentine ran to intercept him, but he tripped over a
garden hose and fell as appellant dived head-first through the window. Valentine got up, but
he was then trapped against the side of the house as appellant could shoot through either of
two windows beside Valentine, and he was in the direct line of fire from his fellow deputies. 
 Three minutes later, appellant shot. (8) Deputy Sanders heard the blast and saw Deputy
Ogburn's hat fly in the air and saw part of his head explode. Appellant then yelled, "Where's
the other one? I'll take him out, where is he?" Inspector Paul Habelt ran toward Sanders,
waving his arms. Appellant shot Habelt in the head, killing him also. The officers then
started shooting back. Sanders saw Deputy Kevin Harris run past a nearby shed, "[a]nd as
he got to the end, I saw him jump, exchange the gunfire, and I saw his leg explode from
impact." But appellant was also wounded during this exchange. He screamed, "I give up. 
I've been hit. I give up. I've been hit." He finally walked out of the house and surrendered. 
Appellant later told news reporters that he had killed the two deputies because "I felt I was
being mistreated." 

 During his case-in-chief, appellant called Ron Shields, the instructor for an
Intermediate Crisis Intervention class that Deputies Valentine, Sanders, and Ward had
attended just ten days before the stand-off. He testified that all three deputies had scored an
"excellent" after their training. Shields noted that the course had covered techniques for
dealing with mentally ill or distressed people, but he explained, "Whenever weapons [are]
involved, this training pretty well goes out the window." He also said that, once a suspect
is separated from his weapon, "you use all means necessary to keep him separated from that
weapon" regardless of his mental instability or distress.

 Defense counsel called Dr. Gilda Kessner, a psychologist who had never talked with
appellant, to testify to her opinion that appellant suffered from a "thought disorder with a
paranoid ideation." Paranoia, she explained, is characterized by "suspiciousness, distrust,
fearfulness." She stated that paranoia is exaggerated in a crisis and "involves a deep mistrust
and suspiciousness and expectation that individuals have a malevolent, deceitful motive
when they deal with you." Paranoia does not prevent someone from acting intentionally or
knowingly, but such a person is "influenced by the disordered thoughts." 

 Dr. Kessner agreed that appellant showed no signs of paranoia until Valentine began
to read him his Miranda rights. She did not find any indications that appellant experienced
any auditory or visual hallucinations. She said that appellant was not insane and that he
could "intentionally or knowingly do anything, shoot in this case. I mean, that's apparent."

 The defense also offered the written transcript of testimony by Dr. Theresa Vail that
had been taken outside the presence of the jury. Dr. Vail was appellant's treating psychiatrist
in jail. But because she had never discussed the crime with appellant, she had formed no
conclusions about whether he might have been experiencing delusions at the time of the
murders. She said that appellant was capable of forming the intent to commit his actions and
able to understand their consequences. Dr. Vail also noted that, while appellant's belief that
he was being poisoned (9) was false, the stomach-aches that he described as being the basis for
this belief are common in anxious people such as appellant.

 After deliberating for one hour, the jury found appellant guilty of capital murder.

 During the punishment phase, the jury heard brief victim-impact testimony from
Deputy Ogburn's widow (10) and son. Deputy Harris testified that his injured leg continued to
affect him and that Deputy Ogburn's wisdom had helped him during his own father's
terminal illness. Deputy Valentine testified that Deputy Ogburn had been a mentor to him
during his law-enforcement career and that the events during the stand-off had adversely
affected him.

 During the defense case-in-chief at punishment, Dr. Vail testified in person. She
diagnosed appellant with depression and "a psychotic disorder not otherwise specified," a
condition that would make a person more dangerous. (11) She did not know if appellant was
mentally ill on the day of the stand-off, and she did not have any indication that he had
previously been treated for a mental illness. Dr. Vail did not begin treating him until four
months after the stand-off, and she never asked him anything about that day.

 Several family members testified that appellant was good with children and took care
of his family. (12) Appellant's sister, Sherry Ross, testified that appellant's older brother had
been executed for murder sometime around 1999. Appellant saw a second brother shot and
killed in 1977. A third brother died of a drug overdose. Ms. Ross testified that appellant had
been committed twice for drug use, but that he had stopped using drugs around 1991 when
he bought his rural property. Another sister, Linda Ross, testified that appellant sometimes
had mental "spells" when his eyes would get wide and he would act suspicious and
distrustful of her. Appellant's mother also testified that, a couple of times, she had seen
appellant get a "weird look" in his eyes, but he was "a good man . . . a loving father. He
loved children. He always played with the nieces and nephews. He'd give anybody the shirt
off his back, if somebody walked up to him and asked him." Various friends testified that
appellant was gentle, honest, even-tempered, and never out of control.

 Dr. David Self, a psychiatrist, testified that he had reviewed various records, but,
because he had never examined appellant, he could not make a formal diagnosis. 
Nonetheless, he opined that appellant had a "chronic and severe psychiatric illness" that was
"centrally involved in the causality of this offense." (13) He thought that the evidence of the
crime showed that appellant was experiencing delusional thinking. Nonetheless, appellant
understood that his actions during the stand-off were wrong and illegal. Dr. Self also thought
that appellant's heavy methamphetamine use fifteen years earlier might have contributed to
his psychosis because this drug destroys brain nerves and tissue.

 After deliberating less than three hours, the jury answered "yes" to the future
dangerousness issue and "no" to the mitigation question. The trial judge then sentenced
appellant to death.

Interviewing Jurors About Pretrial Publicity


 In his first point of error, appellant asserts that the trial judge denied him a fair trial
when he refused to poll the jury, immediately before the start of trial, on whether they had
been exposed to or affected by media coverage of the case. Appellant argues that the public
feeling against appellant "saturated" the local population, thus the decision to proceed with
the trial without polling the jurors about this issue was an abuse of discretion and offended
the Eighth and Fourteenth Amendments.

 Right before trial, appellant asked the judge to poll the empaneled jurors to determine
whether any of them had read an editorial that had appeared in the Athens Daily Review the
day before. (14) Counsel stated that the editorial suggested that law enforcement was watching
what happened in this trial. (15) The trial court responded,

 the Court is not aware, or it's not been brought to the Court's attention any
evidence that the jury has violated its instructions.

 And the Court gave its instructions and will continue to emphasize
those instructions throughout the trial. And without any evidence brought to
the Court, the Court will deny the motion to voir dire the jury of its-regarding
any publicity.

Appellant now argues that the failure to let him make an offer of proof on whether the jury
was affected by the media was a constitutional violation. (16) This point of error is controlled 
by Powell v. State, (17) a case in which we rejected a nearly identical claim.

 In Powell, the defendant argued that the trial court erred in refusing to poll the
jurors-prior to trial but after they had been empaneled and sworn-about a newspaper article
covering a hearing on the admissibility of DNA evidence. (18) Although the trial court refused
to poll the jury about the article, it admonished the jury numerous times not to read any
newspaper articles concerning the case. (19) In that case, we noted that the trial judge could
either deny the defendant's request for a jury poll concerning the article, or he could poll the
jury and risk exposing them to the existence and contents of the article for the first time. By
refusing to poll the jury about the article and reiterating its admonishments, the trial judge
did his best to preserve the integrity of the jury panel. (20) 

 The same is true in this case. The trial court repeatedly instructed the jury panel, the
individual jurors selected, and the empaneled jury not to read, watch, or listen to any media
stories about the case.

* Once the venire panel was qualified, the judge gave three separate instructions not to
read any newspaper articles, watch any television reports, or listen to any radio reports
concerning the case. He excused for cause every panel member who was identified
as not being able to set aside an opinion formed about the case from media reports.


* During the individual voir dire, the judge asked each juror if he could comply with
written instructions not to read any newspaper articles, watch any television reports,
or listen to any radio reports concerning the case. Each juror said that he could.


* At the beginning of trial, the judge instructed the jury not to read any newspaper
articles, watch any television reports, or listen to any radio reports about the case.


* At the end of each day of trial, before releasing the jury, the trial judge instructed the
jury not to read any newspaper articles, watch any television reports, or listen to any
radio reports concerning the case. The jury received this instruction on May 5, May
6, May 7, May 8, May 9, May 10, and May 12.


 Following Powell, we hold that the trial judge did not abuse his discretion by
declining to poll the jury rather than risk exposing the jury to the existence of the Athens
Daily Review editorial for the first time. In following the guiding rules and principles of
Powell, the trial court preserved the integrity of the jury. Point of error one is overruled.

Issues Related to Mental Health


 Appellant raises a number of issues related to his mental health on the day of the
murders. 

A. The Constitutionality of Executing the Severely Mentally Ill

 In his third point of error, appellant asserts that the execution of a severely mentally
ill person offends the Eighth Amendment ban on cruel and unusual punishment and violates
the Equal Protection Clause of the Fourteenth Amendment. Appellant asserts that the
testimony of his mental-health experts was uncontroverted and that they established that
appellant is severely mentally ill and his illness "adversely affected" his behavior on the day
of the murders. He argues that the rules announced by the Supreme Court in Atkins v.
Virginia, (21) banning the execution of the mentally retarded, and in Roper v. Simmons, (22)
banning the execution of juvenile offenders, should be extended to the mentally ill. He relies
upon various pronouncements in the international community, and he cites law-review
articles that argue that there is no rational basis for distinguishing the severely mentally ill
from the mentally retarded.

 However, appellant does not cite any case from any American jurisdiction that has
held that the Atkins rule or rationale applies to the mentally ill. (23) We have previously held,
albeit in unpublished opinions, that "there is no authority from the Supreme Court or this
Court suggesting that mental illness that is a 'contributing factor' in the defendant's actions
or that caused some impairment or some diminished capacity, is enough to render one exempt
from execution under the Eighth Amendment." (24) Furthermore, appellant has not
demonstrated that there is a trend among state legislatures to categorically prohibit the
imposition of capital punishment against mentally ill offenders. (25) Finally, appellant has
failed to show that, if he did suffer from some mental impairment at the time of these
murders, that impairment was so severe that he is necessarily and categorically less morally
culpable than those who are not mentally ill. We, therefore, overrule point of error number
three.

B. "Diminished Capacity" Instruction

 In his fifth point of error, appellant asserts that the trial judge violated his statutory (26)
and constitutional due-process rights by giving the jury the following instruction:

 You are further instructed that you may consider any mental condition, if any,
of the defendant, that he did or did not act intentionally or knowingly in
committing the alleged offense, but you cannot consider any mental condition,
if any, that the defendant lacked the capacity to act intentionally or knowingly.


 At trial, appellant filed a written objection to the court's charge for failing to instruct
the jury that evidence of mental illness may be considered in determining whether or not he
acted intentionally or knowingly. Appellant did not suggest specific language, so presumably
the trial judge drafted the above instruction in response to appellant's written request. (27) 

 Appellant argues on appeal that his "defense was that his active, serious mental illness
prevented him from knowingly or intentionally killing at the moment he pulled the trigger." (28) 
But that was not his defense at trial. No witness testified that appellant-with or without a
mental illness-did not knowingly or intentionally shoot Deputy Ogburn with a single shot
right between the eyes. Indeed, the evidence showed that immediately after he shot his first
victim, appellant shouted, "I got one. Where's the other one?" before he shot another deputy
in the head. None of appellant's experts testified that he did not intend these actions. Indeed,
appellant's trial counsel forthrightly admitted during his closing argument at the guilt stage
that, "yes, a person can have a paranoid delusion, suffer from paranoia and intentionally and
knowingly do what they want to do, in this case, shoot two police officers." At trial, defense
counsel stated that he offered the mental-illness testimony as "just an explanation about what
went on out there." Appellant's mental-illness evidence explained his actions and
demonstrated his motive for killing the deputies-paranoia, suspicion, and distrust of the
officers. It did not rebut the culpable mental state of "intentional or knowing" conduct or
raise any legal justification or exoneration for the murders.

 Although appellant acknowledges that there is no "diminished capacity" defense in
Texas, (29) he nonetheless argues that the trial judge erred by instructing the jury that it was not
permitted to consider mental-illness evidence that appellant "lacked the capacity to act
intentionally or knowingly."

 Appellant cites to this Court's decision in Ruffin, but that case is not analogous. In
Ruffin, the defendant (and others) testified that he suffered from both auditory and visual
delusions. He testified that when he shot at the police officers, he thought he was shooting
at "Muslims." (30) He literally saw and heard Muslims. Under those circumstances, this Court
held that he might be entitled to offer expert psychiatric testimony that some people who
suffer from serious mental diseases and delusions really can and do "see" and "hear"
Muslims (or other figments of their imagination) even though they do not exist. This
evidence was relevant to rebut the element that Ruffin intended to shoot police officers and
would, if believed, lessen the crime from a first-degree aggravated assault of a police officer
to a second-degree aggravated assault (an intentional shooting at "Muslims"). (31)

 In the present case, appellant offered no evidence to suggest that he intended to shoot 
anything or anyone other than the police officers that he killed. (32) Appellant offered no
evidence to suggest that he did not intend to shoot a person. (33) All of his mental-illness
evidence showed why he intentionally and knowingly killed the deputies: He was paranoid
and thought they had "mistreated" him. But motive is not an element of murder or capital
murder. Such mental-illness testimony may be relevant for mitigation purposes during the
punishment phase, but expert testimony that does not directly rebut the culpable mental state
usually may be excluded at the guilt stage. (34)

 In sum, the trial judge was not required to admit any expert testimony concerning
appellant's mental illness during the guilt stage because it did not directly rebut his culpable
mens rea. (35) Thus, appellant was not entitled to any jury instruction concerning that evidence. 
But having requested such an instruction, appellant has not shown that he suffered any harm
when the trial judge gave the jury a legally correct, if unnecessary, instruction concerning the
use of that evidence. Appellant's fifth point of error is overruled.

C. "Mistake of Fact" Instruction

 In his seventh point of error, appellant asserts that the trial judge erred by refusing to
submit a jury instruction concerning mistake of fact based on appellant's "paranoid ideations
and psychotic delusions." He argues that this evidence entitled him to an instruction on the
statutory mistake-of-fact defense (36) because he may have believed that the deputies he killed
were not acting in the discharge of their official duties. He posits that the record suggests
that appellant "mistakenly but honestly believed that the officers were rogue cops, out to
harm or lynch him and his wife, and perhaps take his property."

 First, appellant does not cite to any portion of the record that would support such a
belief. (37) Nor did he cite the trial judge to any such evidence in the record. (38) His assertion
is based entirely upon speculation about what appellant might have been thinking or could
have thought, but there is no evidence that supports a conclusion that appellant did believe
the officers were "rogue cops" who were not acting in lawful discharge of an official duty.
The only evidence that directly supports appellant's paranoid state of mind at the time of the
murder was his statement to reporters that he felt "mistreated." But that evidence does not
raise any "mistake" of a specific historical fact that, if true, would negate his intent to kill
Deputy Ogburn. The issue in Posey v. State, (39) as in the present case, was whether the
defendant was entitled to an jury instruction on the defensive issue of "mistake of fact" when
he did not "properly preserve" that issue by making a timely and adequate request or
objection in the trial court. (40) The purpose of the Posey rule is to prevent a party from
"sandbagging" the trial judge by failing to apprise him, and the opposing party, of what
defensive jury instructions the party wants and why he is entitled to them. (41) Because
appellant failed to tell the trial judge what specific fact he was mistaken about, he was not
entitled to an instruction on this defensive issue. (42)

 Second, even if appellant had thought that the officers were out to harm or lynch him
and his wife (rather than arrest him), that belief was not a reasonable one. The statutory
mistake-of-fact defense explicitly requires that the defendant's mistaken belief about the
existence of a fact is a "reasonable" one "that would be held by an ordinary and prudent man
in the same circumstances as the actor." (43) Although the "reasonableness" of a mistaken
belief is generally a question for the jury, (44) appellant cannot rely upon evidence of his
paranoia and psychotic thinking to raise a "reasonable" mistaken belief concerning the
officers' intentions. (45) The law examines "reasonableness" from the perspective of an
ordinary and prudent person, not from that of a paranoid psychotic who is, by psychiatric
definition, "unreasonable" in his imagined suspicions, delusions, and fears. Mental disease
is not an attribute of the reasonable, ordinary and prudent person. Thus, although the general
rule is that the jury must determine the relative credibility of the evidence raising a
"reasonable belief" about a fact, reliance upon paranoid beliefs and delusions negates the
type of reasonableness that an ordinary and prudent person would have under the
circumstances. (46)

 Third, any mistake of fact that appellant might have made about the officers'
intentions or their right to arrest him did not negate the kind of culpability required for the
commission of capital murder. The culpable mental state in section 19.03(a)(1) applies to
the intentional or knowing murder of a peace officer whom the actor knows is a peace
officer. (47) To prove either capital murder or aggravated assault of a peace officer, the State
must show that the peace officer is "acting in the lawful discharge of an official duty," but
the defendant need not know that specific fact. (48) Thus, any mistake that appellant might have
made about what the officers' intentions were, or whether they were acting in the lawful
discharge of their official duty in arresting him, would not negate the required culpability for
capital murder. (49) 

 For all of these reasons, we overrule appellant's seventh point of error.

D. Justification Instructions

 In appellant's eighth point of error, he claims that the trial judge erred in refusing to
instruct the jury on a variety of justification defenses, including necessity, "defense of home
and property," and defense of another. As with point of error seven, appellant has forfeited
any error on appeal because he failed to specify what facts or legal theory would support
submission of any of these defenses. (50) Merely submitting a multi-page list of bare-bones
objections to the failure to include various statutory defenses and affirmative defenses does
not sufficiently direct the trial judge's attention to the specific facts or theory supporting
submission of such a charge. (51) As this Court noted almost one-hundred years ago, a
defendant who files a laundry-list of written objections to the charge must also specify the
legal or factual reasons why he believes himself entitled to such special instructions. (52) 
Unexplained lists of objections and requests for instructions risk being considered
"sandbagging" objections that fail to preserve any issue for review. (53) 

 Second, this point of error is multifarious because it raises more than one specific
complaint and risks rejection on that basis alone. (54) In this single point, appellant has raised
a potpourri of complaints concerning the failure to give instructions on (1) necessity, (2)
defense of another, (3) defense of "home and property."

 Third, appellant fails to acknowledge that each of these justification defenses requires
that the defendant reasonably believe that his conduct is immediately necessary to avoid a
greater harm. As with the statutory mistake-of-fact defense, a "reasonable belief" is one that
would be held by an ordinary and prudent person, not by a paranoid psychotic. (55) Appellant's
repeated claim that "his paranoid ideations and active psychosis" raise a "reasonable belief"
that his actions were justified is supported neither by law nor common sense.

 Texas law does not recognize the "ordinary and prudent" paranoid psychotic for
purposes of Penal Code justification defenses. The only affirmative defense available under
Texas law for those who commit crimes while suffering from an abnormal mental disease
or defect is insanity under Section 8.01. (56) Appellant did not assert an insanity defense at trial,
and he cannot now claim entitlement to some other statutory defense based upon his mental
disease or defect. (57) Appellant argues that, even though the Penal Code "does not explicitly
contain and carry forward all of the traditional common law doctrines regarding
justification," (58) we should expand upon the Penal Code to embody a free-standing "castle
doctrine" that would permit property owners to kill police officers who come on their
property in response to a 911 "domestic violence-gunshots" call. This we would decline to
do even if we had the authority to create a nonstatutory justification defense. (59)

 For all of the above reasons, we overrule appellant's eighth point of error.


 Lesser-Included Offenses Raised by Mental-Health Evidence


 In his tenth point of error, appellant contends that the trial court erred by refusing to
submit charges on manslaughter and criminally negligent homicide because a reasonable
juror might draw various inferences that could support the notion that Appellant acted
recklessly or negligently, rather than intentionally or knowingly. Appellant notes that if any
evidence, regardless of its strength or credibility, raises the issue that the defendant was
guilty only of the lesser offense, then the charge must be given. (60) He posits that a reasonable
juror "might deem Appellant's act of shooting Officer Ogburn a reckless one, rather than the
result of a conscious decision to commit an unlawful killing" because of appellant's
psychotic paranoia. (61) Alternatively, he argues that "the testimony of Dr. Vail, who diagnosed
an active psychosis, Dr. Kessner, who found paranoid ideations and a thought disorder,
combined with Officer Valentine's testimony describing how a strange look suddenly came
over Mr. Mays' face combine to raise the issue of a failure to perceive risk." (62)

 The culpable mental state for capital murder, however, refers to the result of the
conduct-a person's death-not to the nature of that conduct. (63) That is, there must be some
affirmative evidence, (64) from some source, that at the moment appellant shot Deputy Ogburn
in the head with his deer rifle, he did not intend his death or know that it was reasonably
certain to occur. (65) Appellant fails to point to any evidence in the trial record that
affirmatively shows that he was either reckless or negligent about the likelihood that a death
would occur at the moment he shot Deputy Ogburn. Indeed, appellant's very first words
immediately after shooting the deputy were: "Where's the other one? I'll take him out,
where is he?" At most, appellant's evidence of a mental illness or impairment might
demonstrate some confusion about the circumstances surrounding his over-all conduct during
the stand-off, but none of that evidence affirmatively shows that appellant did not intend to
kill when he shot Deputy Ogburn. Appellant's tenth point of error is overruled. 

Other Guilt-Stage Jury-Instruction Claims


A. Sudden Passion and Provocation Instruction

 In his ninth point of error, appellant contends that the trial judge erred in failing to
instruct the jury on the "traditional" defenses of sudden passion and provocation. He asserts
that "[s]udden passion and provocation have always reduced the degree of criminal
culpability in Texas." (66) Thus, the Legislature did not have the authority to eliminate the
issues of "sudden passion" and "provocation" during the guilt phase of a capital-murder
trial. (67) He relies upon an 1895 case, Larson v. State, (68) and a 1903 case, Vann v. State, (69) for
the proposition that those cases placed "little, if any, reliance on any statutory or
constitutional provision" in stating that the defendants were entitled to jury instructions on
manslaughter. (70) In both of those cases, however, this Court did rely upon extant statutory
law, explicitly in Larson and implicitly in Vann. (71) 

 There is no free-floating, non-statutory, common-law right to an instruction on sudden
passion and provocation in a capital-murder trial. We have previously rejected appellant's
contention, (72) and his present arguments fail to persuade us that the Texas Legislature did not
have authority to eliminate the former statutory offense of "sudden passion" manslaughter
from consideration in the capital-murder context. We overrule point of error nine.

B. Constitutionality of "Lawful Discharge of an Official Duty"

 In his eleventh point of error, appellant claims that the aggravating element of capital
murder-the intentional killing of a peace officer "who is acting in the lawful discharge of an
official duty"-is unconstitutionally vague. At trial, appellant moved for a directed verdict
claiming that the evidence was insufficient to prove that the officers were discharging an
official duty, and he objected to the trial court's failure to define the phrase "acting in the
lawful discharge of an official duty." He does not cite to any portion of the trial record where
he asserted that the phrase was "unconstitutionally vague." Appellant did not make this
constitutional vagueness argument in the trial court; therefore, his complaint is not preserved
for review. (73)

 At any rate, the term is not unconstitutionally vague. As we have previously stated
in Montoya v. State, (74) another capital-murder case, 

 Whether [the deceased police officer] was making a lawful arrest is not
relevant to determining if [he] was acting in the lawful discharge of his official
duties. A police officer is still acting within the lawful discharge of his official
duties when he makes an unlawful arrest, so long as he is acting within his
capacity as a peace officer. (75)


More recently, we have repeated that "as long as the officer was acting within his capacity
as a peace officer, he was acting within the lawful discharge of his official duties." (76) It is
undisputed in this case that all of the officers involved, beginning with Deputies Valentine,
Sanders, Ward, Ogburn, and Habelt, were acting in the lawful discharge of their duties as
police officers. Appellant may have felt that the officers shouldn't have responded to the 911
call or shouldn't have tried to arrest him, but he never suggested that these men were not
police officers or that they were not acting within their capacity as police officers during the
stand-off. 

 Furthermore, the phrase "lawful discharge of an official duty" is not statutorily
defined, but it does have an ordinary meaning that jurors can apply using their own common
sense: (77) The person killed was a police officer who was, at the time of his death, lawfully
acting as a police officer. We overrule appellant's eleventh point of error.

C. The Trial Court's Instruction on Reasonable Doubt

 In his sixth point of error, appellant complains that the trial judge "diluted" the
reasonable-doubt standard in his instructions to the jury. At trial, he objected that the trial
court failed to explain to the jurors that the reasonable-doubt standard is a "high burden of
proof that may be set by each individual juror at any degree of certainty less than absolute
certainty." He also objected that the jury instructions failed to instruct the jury on
"preponderance of the evidence" and "clear and convincing evidence" and explain how those
standards differ from proof beyond a reasonable doubt. 

 The trial judge instructed the jury as follows:

 It is not required that the prosecution prove guilt beyond all possible doubt. 
It is required that the prosecution's proof excludes all "reasonable doubt"
concerning the defendant's guilt.


 In Woods v. State, (78) we held that giving this same instruction to the jury in a capital-murder trial was not an abuse of discretion. Appellant cites Woods, but argues that we failed
to include any discussion of Victor v. Nebraska in that case. (79) In Victor, the Supreme Court
held that the standard of "beyond a reasonable doubt" is a due-process requirement in a
criminal case, but that the Constitution neither prohibits trial judges from defining reasonable
doubt nor requires them to do so. (80) Appellant fails to explain how Victor affects our
reasoning in Woods. Both cases state that courts may or may not define the term "reasonable
doubt." In Texas, we have said that it is "the better practice" not to define that term, and
Victor does not suggest otherwise. (81) We overrule appellant's sixth point of error.

Issues Relating to the Punishment Stage


A. Sufficiency of the Evidence to Support the Finding of Future Dangerousness

 In his fourteenth point of error, appellant contends that the evidence is insufficient to
support the jury's finding on the future-dangerousness issue. (82) Appellant states that "[t]he
crime facts in this case are not enough to sweep away the good in Mays'[s] life history" and
that "[w]ith the tools and facilities at the disposal of Texas correctional personnel, it would
be a rare prisoner indeed who could present much of a threat that would 'continue' over
time." These arguments were presented to, but rejected by, the jury at the punishment stage.

 The evidence at trial showed that appellant, without warning, suddenly turned from
a calm, cool, and polite gentleman discussing matters with an inquiring deputy into a violent
sharpshooter who intentionally killed two police officers and seriously wounded a third
during an hour-long stand-off involving more than a dozen officers. The violence began
when Deputy Valentine told appellant that he was under arrest; appellant refused to obey,
listen to, or reason with an authority figure. His reaction to the exercise of authority by a law
enforcement officer was violent. Appellant justified his murderous conduct by stating that
he had been "mistreated" by the officers. The jury convicted appellant of capital murder, and
its only two punishment choices were prison or death. Prison is a part of "society,"and the
future-dangerousness issue includes consideration of appellant's likely future behavior while
in prison for life. The prison system is run by law enforcement and correctional officials, and
any person sentenced to prison must obey those authority figures, regardless of whether they
feel they are being "mistreated." 

 A jury is permitted to consider a variety of factors when determining whether a
defendant will pose a continuing threat to society. (83) Viewed in the light most favorable to
the jury's verdict, the circumstances of this offense, including the evidence that he
deliberately killed two police officers, as well as the evidence of appellant's prior
confrontations with authority figures, support a finding that there is a probability that
appellant would commit future acts of violence (quite possibly against authority figures) in
prison. (84) We overrule appellant's fourteenth point of error.

B. Victim-Impact Evidence.

 In his twelfth point of error, appellant raises six sub-issues: four relate to the trial
judge's refusal to give requested victim-impact instructions and two relate to the trial judge's
admission of victim-impact and victim-character evidence.

 Regarding his instruction-based complaints, appellant argues that the trial judge 
violated the Eighth and Fourteenth Amendments in refusing to explicitly limit the jury's
consideration of victim-impact evidence. (85) Appellant claims entitlement to these instructions
based on Mosley v. State, (86) a case in which we urged trial courts "to place appropriate limits
upon the amount, kind, and source of victim impact and character evidence." (87) The trial
judge did not err in refusing the requested instructions.

 First, appellant overstates the holding in Mosley. What was encouraged in Mosley was
the use of Texas Rule of Evidence 403 to limit the introduction of victim-impact and
character evidence in the first place, rather than the use of instructions to limit consideration
of evidence that had already been admitted. (88) 

 Second, nearly identical claims were rejected in Saldano v. State. (89) There, the
defendant had requested some twenty-five non-statutory punishment charges, including
versions of the four instructions requested in this case, none of which were given by the trial
court. (90) We stated,

 We believe it sufficient to dispose of these points by recognizing that the trial
court submitted a charge consistent with applicable state statutes, which have
withstood numerous constitutional challenges. These state statutory provisions
meet federal constitutional requirements by narrowing the class of
''death-eligible defendants'' and they arguably provide more than required by
the federal constitution by providing a jury a vehicle to ''fully'' consider
mitigating evidence "in every conceivable manner in which the evidence might
be relevant." (91)

 The same is true in this case: The trial judge submitted a charge consistent with
applicable state statutes.

 We now turn to appellant's admission-based complaints. Appellant failed to preserve
this issue for review because he did not object to the admission of the victim-impact or
character evidence at trial. (92) Nevertheless, his claim is without merit. First, appellant asserts
that the trial court let in far too much victim-impact evidence, exceeding the "quick glimpse"
permitted by the Eighth Amendment. We review a trial court's admission of victim-impact
and character evidence for an abuse of discretion. (93) The State called four witnesses to give
victim-impact and character testimony: Deputy Ogburn's wife of thirty-six years, Pat
Ogburn; his son, Tony Ogburn Jr.; Deputy Harris; and Deputy Valentine.

 Mrs. Ogburn testified that her husband's death was "devastating." She explained that
she has had medical issues since having a stroke in 1996, and her husband was her "sole
source . . . of everything." Because of his death, she had to move closer to her siblings so
that they could take care of her. She said her husband was a man of faith who wanted
nothing more than to "help the public." He "truly believed in being a police officer. That
was his life." Mrs. Ogburn's testimony took up slightly more than four pages of the record.

 The next witness was Ogburn's son, Tony Jr. He testified that he was very close to
his dad, that they would talk every day, and that now he does not know who he "can call to
talk to." Tony Jr.'s main concern was that his dad was no longer there for his mom. He also
expressed sorrow that his seven children lost their grandfather. Tony Jr. testified that his dad
"liked talking to young people about the rights and wrongs of life, and just to try to help, you
know, the younger generation." His testimony took up three pages of the record.

 Deputy Harris then testified. He also described Deputy Ogburn's death as
"devastating." The deceased was his "go-to-guy" when his father had a terminal illness. He
said the two of them would talk every morning-a part of his day he knew he could enjoy. 
He described Deputy Ogburn as wise and willing to share that wisdom. Deputy Harris's
testimony took up slightly more than six pages of the record, but more than half of that
concerned the impact of the injury he himself sustained when appellant shot him.

 Similarly, Deputy Valentine described Deputy Ogburn as a confidant and role model. 
Since his death, "There's times I don't want to even come to work anymore." Deputy
Valentine described Deputy Ogburn as supportive, friendly, calming, and dedicated to his
wife. Deputy Valentine's testimony took up six pages of the reporter's record-some of
which concerned the impact of appellant's conduct of threatening him with a deer rifle.

 Appellant notes that he did not know the Ogburn family or that Deputies Harris and
Valentine were good friends of Deputy Ogburn's. Regardless, all of this testimony was
admissible: This was evidence concerning the impact of the death of the victim named in the
indictment (Tony Ogburn) on others, i.e., Ogburn's close family and friends. (94) It was
admissible to rebut appellant's mitigation case, regardless of whether "the defendant was
ignorant of the specific facts regarding the victim's character or relationships." (95)

 The victim-related evidence took up only a brief portion of the roughly 320-page
punishment record. "Sheer volume" was not a factor in this case. (96) The four witnesses
testified succinctly and without objection. The trial judge acted within his discretion in
admitting these short bits of victim-impact and victim-character testimony.

 Finally, appellant argues that the trial judge violated his constitutional and statutory
rights by admitting "victim impact" evidence relating to those not named in the indictment,
specifically Deputy Harris and Deputy Valentine. Appellant notes that Deputies "Harris and
Valentine each testified in great details about their injuries, their losses, the changes in their
lives, the changes in their family's lives as a result of this shooting incident." Appellant relies
on Cantu v. State, (97) in which we held that admission of victim-impact and character evidence
is proper only as to the "victim" for whose death the defendant is being tried, not a second
victim killed in the same transaction. (98) 

 Deputies Harris and Valentine did provide classic victim-impact testimony (relating
to the impact Ogburn's death had on them), but the testimony about their own injuries and
losses was admissible as same-transaction testimony. (99) None of that testimony falls into a
class of evidence this court has traditionally disfavored: third-party testimony about the
impact of an extraneous offense (even one occurring during the same transaction) involving
a victim not named in the indictment. (100) No third person testified about the impact of Deputy
Harris's or Deputy Valentine's injuries upon that third person. Because the trial judge acted
well within his discretion regarding the admission of victim-impact and character evidence
and did not err in refusing the requested charges, we overrule point of error twelve.

C. Jury Argument

 In his second point of error, appellant complains that the prosecutors made "a series
of egregiously improper remarks" during the closing arguments at the punishment stage. He
asserts that the prosecutors "pitched a death sentence" based on appellant's mental illness,
thus using it as a "two-edged sword" of aggravation instead of mitigation. (101) Appellant
argues that mental illness and its effects upon one's conduct are, as a matter of law,
mitigating and can never be considered as rendering a person more likely to commit acts of
violence. That is not the law. Mental illness, like childhood abuse, is not mandatorily
mitigating, although it is evidence that the jury must be able to consider and give effect to
as it deems appropriate. (102) However, we will not review the propriety of the prosecutor's
arguments, as appellant failed to object to those arguments at trial. He has failed to preserve
any issue for appeal. (103) We overrule point of error two.

D. Punishment-Phase Instructions to the Jury 

1. Failure to include the statutory non-unanimity instruction

 In his fourth point of error, appellant complains that the trial court omitted statutorily
required language from the mitigation-issue instructions. He is correct. The trial judge erred
by failing to instruct the jurors that they need not agree on what particular evidence supports
a finding on the mitigation special issue. However, appellant failed to notice or object to this
omission, and thus he may obtain a reversal of his sentence only if he shows that this error
caused "egregious harm" with respect to sentencing, that is, that the defendant was deprived
of a fair sentencing trial. (104)

 We have recently found that the omission of the statutory non-unanimity instruction
was harmless error under Almanza's (105) "egregious harm" standard. In Young v. State, (106) we
stated that this instruction is not constitutionally required for purposes of the Texas special
issues. (107) In addressing the issue of harm, the Court explained that every single juror had to
agree that there were no mitigating facts or circumstances that called for a life sentence rather
than a death sentence. (108) Thus, if even one juror believed that there was some mitigating
fact-any mitigating fact-that called for a life sentence, that juror could not join in a verdict
in which the jury unanimously found that there was no mitigating circumstance. (109) 

 Appellant attempts to distinguish Young from the present case by contending that the
prosecutor in this case "repeatedly suggested that the defense was required to submit a single
mitigation theory." (110) In the record excerpts that appellant cites, the prosecutor simply
pointed out the inconsistencies in the evidence presented by the defense: appellant was a
calm, friendly, likeable neighbor versus he was a paranoid psychotic. But the prosecutor
never suggested or implied that the jury had to unanimously decide which defensive theory,
if either, it chose to believe. Any individual juror could believe or disbelieve either theory; 
the prosecutor's thrust was that a juror could not simultaneously believe both because they
were inconsistent. (111) In this case, as in Young, (112) the appellant has failed to show that he
suffered "egregious harm" from the omission of the statutory non-unanimity instruction. We
overrule his fourth point of error.

2. Other punishment-stage jury-instruction claims

 In points of error fifteen through twenty-one, appellant raises various other claims
concerning the punishment-phase jury instructions. 

 In point of error fifteen, he claims that the trial judge erred in failing to submit issues
on deliberation and provocation as those special issues previously existed in Texas statutes. 
In 1991, when the Legislature added the mitigation special issue, it deleted those dealing with
deliberation and provocation because those matters were subsumed by the mitigation issue. (113) 
Any evidence that might show a lack of deliberateness on the part of the defendant or
provocation by the murder victim can be fully considered as a mitigating circumstance under
the current second special issue. (114) And if the evidence does show careful deliberation or the
lack of provocation, that evidence may be considered under the future-dangerousness
issue. (115) 

 In point of error sixteen, appellant argues that the trial judge erred by instructing the
jury, as required by statute, that the definition of "mitigating evidence" limits the concept of
mitigation to "evidence that a juror might regard as reducing the defendant's moral
blameworthiness." (116) We have repeatedly rejected appellant's argument, and he fails to
persuade us that these prior decisions were incorrect. (117) 

 In his seventeenth point of error, appellant contends that the trial judge erred in failing
to define various terms and phrases-including "probability" and "continuing threat to
society"- in the first special issue. Appellant acknowledges that we have repeatedly rejected
this contention in prior cases, (118) and we are not persuaded by his arguments that those cases
were incorrectly decided.

 In his eighteenth point of error, appellant complains that the trial judge failed to
instruct the jurors that they could return a life sentence even if they concluded that their
honest answers to the two special issues would require the trial judge to sentence the
defendant to death. He argues that the Eighth Amendment "require[s] the trial court to
empower the jury with a vehicle capable of giving effect" to the evidence. (119) Appellant cites 
no precedent for his proposition that the jury must have "unfettered sentencing discretion"
to impose a life sentence even though the law and the facts, as viewed by each and every
juror, would require a sentence of death. The Supreme Court has held that such unbridled
discretion is not required by the constitution. (120) Furthermore, appellant has not shown any
theory for obtaining a life sentence that is outside the scope of the special issues. And he
failed to raise this specific claim in the trial court, (121) thus his sentence could be reversed only
if he established error and that error caused egregious harm. (122) He has failed to show either
error or egregious harm.

 In his nineteenth point of error, appellant claims that the "10-12 Rule" violates the
rights of "lone, minority, and dissenting jurors" who would effectively lose their voting
rights. He argues that jurors must be told of their right to "veto death" by refusing to return
any verdict during the sentencing stage. We have previously held that the "10-12 Rule" is
constitutional and that no Supreme Court precedent requires the trial judge to inform the
jurors of the effect of a "holdout" juror. (123) On appeal, appellant couches his complaint in
terms of the constitutional right of jurors, rather than the rights of the defendant. He never
brought that argument to the trial judge's attention; thus, we decline to address that aspect
of his claim.

 In his twentieth point of error, appellant claims that the trial judge's instruction that
the jurors shall "consider all evidence . . . that militates for or mitigates against the imposition
of the death penalty" unconstitutionally permits "vague and overbroad aggravators and other
irrational procedures to impose capital punishment." (124) We have previously rejected these
arguments, and appellant fails to persuade us that we were incorrect in doing so. (125)

 In his twenty-first and final point of error, appellant claims that the trial court erred
in refusing to assign a burden of proof to the State in the mitigation-issue instructions. This
Court has consistently held that, under Texas statute, the State does not bear any burden of
proof in the mitigation issue and that the statute setting out that issue and instructions is
constitutional. (126) We decline appellant's invitation to overrule established law.

 We overrule points of error fifteen through twenty-one.

 Having reviewed all of appellant's claims, we find that none of them require reversal
of the jury's verdict, and we therefore affirm the trial court's judgment and sentence.




Delivered: April 28, 2010

Publish
1. Tex. Penal Code § 19.03(a)(1).
2. Tex. Code Crim. Proc. art. 37.071 § 2(g).
3. Deputy Valentine testified that he had just returned to the sheriff's office after attending a
peace officers' memorial service for fallen officers when he received the dispatch.
4. Appellant was a welder. His property contained a residence, several sheds, considerable
welding equipment, and some farm machinery, as well as a variety of farm animals.
5. Valentine had turned on his patrol-car videotape and body microphone as he pulled up to
appellant's property. Virtually everything that was said by the officers, appellant, and Candis during
the stand-off was on the audio tape, but the fixed-position video recorder did not capture much of
the action. The tape is almost five hours long, although the stand-off itself lasted less than an hour.
6. Later testimony showed that appellant almost drove into the back of Valentine's pick-up
truck as Valentine was backing out of his driveway one day. The deputy was off-duty, in plain
clothes, and with his wife, but when he saw appellant continue to swerve down the road, he followed
the car until it pulled into a driveway. When Valentine walked up to the driver's door and asked the
driver to step out, appellant got out and hit the deputy in the head with his fist. Valentine thought
that appellant was intoxicated. Although appellant was arrested, the charge was later dismissed.
7. All of this conversation was captured on Valentine's recorder. Valentine repeatedly
promised not to hurt appellant, but appellant yelled that he feared they would kill him and said that
"Ya'll killed all three of my brothers." [According to later witnesses, appellant did have three
brothers who were all dead: one executed by the state; one shot to death; and one who died of a drug
overdose.] Appellant yelled, "You've got a gun and I've got one." When Valentine asked appellant
to admit that Valentine had been honest with him, appellant responded, "You tried to take me to
jail!" Appellant expressed confusion about why he was "the bad guy" when the officers had
originally come to help his wife. He was mad that Deputy Valentine tore his T-shirt when grabbing
for him. He said, "I'm sick, I'm feeling real sick, I'm about to die, anyway, I was poisoned." Later,
he said that he was "a military man." [Later witnesses said that appellant joined the Army when he
was young.]
8. All of the witnesses, including the Nicholsons' daughter, testified that this was the first shot
fired.
9. See supra note 7.
10. Mrs. Ogburn, who testified from her wheelchair, said that she suffered a stroke in 1996,
and ever since then her husband had taken care of all of her needs. After his death, she had to move
and now lives with her sister in The Colony, TX.
11. She stated that a person with the type of psychosis that appellant had might suddenly "go
off" when he felt threatened. Dr. Vail said that appellant had already had problems with a fellow
inmate, and he thought that the jailers were poisoning his food.
12. Candis's daughter, Christina White, testified that she was relieved when appellant married
her mother, who was mentally unable to take care of herself. Ms. White noticed that a couple of
times appellant suddenly changed moods without any warning.
13. Based on listening to the tape recording of the stand-off, Dr. Self opined that appellant's
statements and actions throughout were consistent with someone who was coming in and out of a
delusional state.
14. In his Brief, appellant cites to some fourteen articles, a couple of electronic signs, and an
obituary as examples of the "saturating" media coverage. The State asserts that these items are not
proper for consideration because they were never presented to the trial court and because of a lack
of "citations, or even dates of supposed publication." We have no doubt that the pretrial media
coverage was substantial, but the only question before the trial judge was whether it should poll the
jury on its exposure to the single editorial that appellant presented to the judge.
15. At trial, appellant argued that the editorial appeared "to communicate to the jurors that the
law enforcement and policemen of Henderson County are watching this jury to see what the outcome
is. And the implication being that-the implication could be drawn that since they're all residents of
Henderson County that they will be-that they may be required in the future to seek protection and
service from law enforcement." The State disagreed with this characterization of the editorial,
saying, "I think it just indicates there were two individuals that were known to the editor." 
16. Cf. Henley v. State, 576 S.W.2d 66, 73 (Tex. Crim. App. 1978) ("[T]he trial court's refusal
to grant appellant a pretrial hearing to introduce evidence in support of his motion for change of
venue precluded a determination, as contemplated by our law, of the community attitude toward
appellant and constituted a deprivation of due process.").
17. 898 S.W.2d 821 (Tex. Crim. App. 1994).
18. Id. at 828.
19. Id.
20. Id. See W.R. Frothingham, Interrogation or Poll of Jurors, During Criminal Trial, as to
Whether They Have Read Newspaper Articles Pertaining to Alleged Crime or the Trial, 15 A.L.R.2d
1152, *1 ("The few cases that involve this specific point all uphold the trial court where it refuses
to interrogate, or refuses to let a party interrogate, the jurors as to the reading of newspaper articles
relating to the trial or the crime. The decisions generally turn on the fact that the trial court had
instructed the jury not to read the articles or that there had been no showing by the moving party that
the jurors had in fact read them."); United States v. Jackson, 649 F.2d 967, 976 (3rd Cir. 1981) ("To
require the trial court to conduct an individual voir dire of all of the jurors, who have been repeatedly
and properly instructed regarding news media reports, whenever there are prejudicial news media
reports, rather than to limit the voir dire to jurors, if any, who have seen or heard such reports, is not
consistent with the 'large discretion' needed by the court to move the trial along both expeditiously
and fairly."); Young v. State, 623 S.E.2d 491, 495-96 (Ga. 2005); Weaver v. State, 763 So. 2d 972,
977 (Ala. Crim. App. 1998), overruled on other grounds by Ex parte Rice, 766 So. 2d 143 (Ala.
1999) ("'In the absence of any allegation that any juror actually read [newspaper articles about the
case], we find no error in the judge's failure to poll the jury to determine whether or not any juror
may have read [newspaper articles.]'"); Carlyle v. State, 428 N.E.2d 10, 13-14 (Ind. 1981) (same);
State v. Marshall, 353 A.2d 756, 759 (Conn. 1974) (same). But see State v. Bey, 548 A.2d 846, 870
(N.J. 1988) (holding "that where a timely, properly supported midtrial motion to poll the jury
concerning prejudicial publicity is refused, and there is a realistic possibility that information with
the capacity to prejudice the defendant may have reached one or more members of the jury, the
defendant must be given a new trial."). In Bey, the problem was that the jury may have read about
an extraneous murder that the defendant had committed. The court stated, "the midtrial publicity
. . . disclosed that defendant was going to be tried for a second murder after the completion of the
first trial. Jurors exposed to this publicity could have discovered that the second murder was
committed close in time and in a similar manner to the Alston murder. It is hard to imagine publicity
with a greater capacity to prejudice a defendant's case." Id. at 869-70. 
21. 536 U.S. 304 (2002).
22. 543 U.S. 551 (2005).
23. Several state courts have expressly declined to extend the Atkins ruling to the mentally ill
in published opinions. See, e.g., Johnston v. State, 27 So.3d 11, 26-27 (Fla. 2010); State v. Ketterer,
855 N.E.2d 48 (Ohio 2006); Matheney v. State, 833 N.E.2d 454 (Ind. 2005); Hall v. Brannan, 670
S.E.2d 87 (Ga. 2008). Others have done so in unpublished opinions. Coleman v. State, No. W2007-02767-CCA-R3-PD, 2010 WL 118696 (Tenn. Crim. App. Jan. 13, 2010) (not designated for
publication); Johnson v. Comm., No. 2006-SC-000548-MR, 2008 WL 4270731 (Ky. Sept. 18, 2008)
(not designated for publication). Federal courts have also rejected appellant's argument for various
reasons. See, e.g., ShisInday v. Quarterman, 511 F.3d 514 (5th Cir. 2007) (claim procedurally barred 
"for failure to present the issue to the state court. In addition, this circuit's precedent precludes that
argument, unless the petitioner contends he is insane and therefore incompetent to be executed.");

 In re Neville, 440 F.3d 220, 221 (5th Cir. 2006) (citing In re Woods, 155 Fed. Appx. 132, 136 (5th
Cir. 2005) and stating that applicant's claim of mental illness as a bar to execution did not rely upon
a new rule of constitutional law made retroactive by the Supreme Court ).
24. Tabler v. State, No. AP-75,677, 2009 WL 4931882, *1 -2 (Tex. Crim. App. Dec. 16, 2009)
(not designated for publication); see also Sprouse v. State, No. AP-74,933, 2007 WL 283152, *8
(Tex. Crim. App. Jan. 31, 2007) (not designated for publication); Battaglia v. State, No. AP-74,348,
2005 WL 1208949 at *10 & n. 39 (Tex. Crim. App. May 18, 2005) (not designated for publication)
(citing Colburn v. State, 966 S.W.2d 511 (Tex. Crim. App. 1998)).
25. See Atkins, 536 U.S. at 312 ("the 'clearest and most reliable objective evidence of
contemporary values is the legislation enacted by the country's legislatures.'") (quoting Penry v.
Lynaugh, 492 U.S. 302, 331 (1989)); see also Tabler, 2009 WL 4931882, *2 (noting, in rejecting 
claim that mentally ill offenders should be exempt from execution, that defendant "does not
demonstrate that there is a trend among state legislatures to categorically prohibit the imposition of
capital punishment against mentally ill offenders."). 
26. Appellant relies on article 36.14 of the Texas Code of Criminal Procedure, which requires
the trial court to distinctly set forth the law applicable to the case, and article 38.36(a), which permits
the admission of evidence to show the accused's state of mind at the time of the offense as the legal
basis for his complaint. 
27. At the end of his nine-page list of written objections to the jury charge, appellant, in his
objection number 25, set out eleven reasons why he opposed any limitation upon "the inference the
jury may draw from the evidence of mental disease or defect." Thus, although appellant requested
a jury instruction on how mental illness may be considered in determining whether he acted
intentionally or knowingly, and the trial judge gave such an instruction, appellant then complained
about the wording of the actual instruction given. 
28. Appellant's Brief at 49.
29. See Ruffin v. State, 270 S.W.3d 586, 593, 596 (Tex. Crim. App. 2008); Jackson v. State, 
160 S.W.3d 568, 573 (Tex. Crim. App. 2005). 
30. Ruffin, 270 S.W.3d at 594.
31. Id. at 596-97.
32. Such evidence, if it had been proffered and admitted, would directly rebut the element that
elevated murder under Tex. Penal Code § 19.02 to the capital murder of a police officer under Tex.
Penal Code § 19.03(a)(1).
33. Such evidence, if it had been proffered and admitted, would directly rebut the culpable
mental element of either capital murder or murder. Id.
34. See Ruffin, 270 S.W.3d at 595-96 (expert testimony concerning a defendant's mental
illness "may, in a particular case, be excluded under other evidentiary rules, such as Rules 403 or
703-705, if the probative value of the proffered evidence is substantially outweighed by the danger
of unfair prejudice, if the expert is insufficiently qualified, or the testimony is insufficiently relevant
or reliable under our state's guidelines for expert testimony. Such evidence may also be excluded
if it does not truly negate the required mens rea."); Jackson, 160 S.W.3d at 574; cf., Ward v. State,
No. AP-75,750, 2010 WL 454980 at *2 (Tex. Crim. App. Feb. 10, 2010) (not designated for
publication) (trial court did not err in excluding expert's testimony that capital-murder defendant was
psychotic and had paranoid delusions which led him to believe that there was a conspiracy by city
officials to harm him and caused him to murder city employee); see also United States v. Cameron,
907 F.2d 1051, 1067-68 (11th Cir. 1990) ("Evidence offered as 'psychiatric evidence to negate
specific intent' is admissible . . . when such evidence focuses on the defendant's specific state of
mind at the time of the charged offense," but holding that defendant failed to demonstrate how her
expert's generalized psychiatric testimony would negate intent in drug-trafficking prosecution).
35. See Ruffin, Jackson, and Ward, supra.
36. Tex. Penal Code § 8.02(a) ("It is a defense to prosecution that the actor through mistake
formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability
required for commission of the offense.").
37. He states that "a reasonable juror might conclude that Mays actually believed that a vast
and brutal conspiracy of armed men, abusing their status [as] peace officers had killed his three
brothers. There was a religious fervor in Mays' words and actions. Some of Mays' words [during
the stand-off] did not seem to fit into the context in which they were uttered. The mental health
experts thought Mays had a thought disorder." Appellant's Brief at 59. 
38. The entirety of appellant's written objection at trial was as follows: "The Defendant objects
to the Court's failure to instruct the jury on the law of mistake of fact." This objection is not
sufficient to direct the trial judge's attention to the evidence upon which appellant would rely for
entitlement of such an instruction. See Goodrich v. State, 156 S.W.3d 141, 147-48 (Tex.
App.--Dallas 2005, pet. ref'd) ("When requesting an instruction on the defense of mistake of fact,
the party must specify the fact alleged to have been mistaken."); Williams v. State, 930 S.W.2d 898,
903 (Tex. App.--Houston [1st Dist.] 1996, pet. ref'd). Absent a proper request, the trial judge does
not err by failing to instruct the jury on the defense of mistake of fact. Posey v. State, 966 S.W.2d
57, 62 (Tex. Crim. App. 1998).
39. 966 S.W.2d 57 (Tex. Crim. App. 1998).
40. Id. at 62.
41. Id. at 63; see also Tolbert v. State, ___ S.W.3d __, ___, No. PD-0265-09, 2010 WL
935377, * 2 n.6 (Tex. Crim. App. March 17, 2010) ("Our decision in Posey was intended "to
discourage parties from sandbagging or lying behind the log" and to discourage a defendant from
retrying the case on appeal under a new defensive theory, effectively giving the defendant "two bites
at the apple.").
42. See Goodrich, 156 S.W.3d at 147-48.
43. Tex. Penal Code § 1.07(42); see Winkley v. State, 123 S.W.3d 707, 712 (Tex.
App.--Austin 2003, no pet.) (citing Bang v. State, 815 S.W.2d 838, 841 (Tex. App.--Corpus Christi
1991, no pet.)).
44. See Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) ("Whether appellant's
mistaken belief was 'reasonable,' so as to comport with the requirements of § 8.02, should have been
left for the jury to decide as trier of fact.").
45. See, e.g., King v. State, 919 S.W.2d 819, 821-22 (Tex. App.--El Paso 1996, no pet.)
(defendant not entitled to instruction on mistake of fact when he testified that he thought his wife
was dead at the time he choked her with an electrical cord because any such belief was manifestly
unreasonable, as an ordinary and prudent person could and would have easily verified that fact first);
See People v. Mejia-Lenares, 135 Cal. App. 4th 1437, 1454, 38 Cal. Rptr. 3d 404, 415 (Cal. Ct. App.
2006) (stating that a mistake-of-fact defense "cannot be predicated upon delusions which are the
product of mental illness.").
46. Id.
47. Tex. Penal Code § 19.03(a)(1) (murder of a peace officer requires proof that the
defendant committed murder as defined in section 19.02(b)(1) and "the person murders a peace
officer or fireman who is acting in the lawful discharge of an official duty and who the person knows
is a peace officer or fireman").
48. See Salazar v. State, 643 S.W.2d 953, 956 (Tex. Crim. App. 1983) ("[A] conviction [for
aggravated assault on a peace officer] does not depend on whether the arrest was legal, or the
defendant's belief about its legality. . . . [W]hile the State must still prove the defendant knew or had
been informed that he was assaulting a peace officer, proof that he also knew the officer was
'lawfully discharging an official duty' is unnecessary"); see also Montoya v. State, 744 S.W.2d 15,
30 (Tex. Crim. App. 1987), overruled on other grounds, Cockrell v. State, 933 S.W.2d 73 (Tex.
Crim. App. 1996) (evidence in a capital-murder trial that the police officer was making an
unauthorized warrantless arrest did not disprove that the officer was in the lawful discharge of an
official duty). 
49. See id.
50. See Lankston v. State, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) ("
As regards
specificity [of an objection], all a party has to do to avoid the forfeiture of a complaint on appeal is
to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly
enough for the judge to understand him at a time when the trial court is in a proper position to do
something about it." ); Starks v. State, 127 S.W.3d 127, 133 (Tex. App.--Houston [1st Dist.] 2003,
pet. dism'd) (to preserve a complaint about the trial court's failure to instruct on self-defense, a
defendant must make a timely objection that specifically states the legal basis for the objection);
Williams v. State, 930 S.W.2d 898, 903 (Tex. App.--Houston [1st Dist.] 1996, no pet.) (defendant's
bare request for an instruction on mistake of fact was too general to preserve error because he failed
to comply with art. 36.14 and "distinctly specify" what fact he was purportedly mistaken about).

 Appellant's objections were as follows:

 The Defendant objects to the Court's failure to instruct the jury on the law of defense
of another.

 The Defendant objects to the failure to instruct the jury on the law of defense of
home and property. 

 The Defendant objects to the Court's failure to instruct the jury on the law of necessity.
51. Appellant filed an eight-page laundry list of bare-bones objections to the jury charge. 
52. Wilson v. State, 189 S.W. 1071, 1072 (Tex. Crim. App. 1916) ("Appellant filed with the
judge several grounds of objections to his charge. He also requested some 11 special charges, all
of which were refused, except the one to disregard the second and third counts above mentioned,
which was given. In neither requested charge, nor in any way connected therewith, did he give any
reason or statement why it should be given. This is essential in even a felony case.").
53. See Tex. Code Crim. Proc. art. 36.14 (stating that, before the court's charge is given to
the jury, "the defendant or his counsel shall have a reasonable time to examine the same and he shall
present his objections thereto in writing, distinctly specifying each ground of objection. Said
objections may embody errors claimed to have been committed in the charge, as well as errors
claimed to have been committed by omissions therefrom or in failing to charge upon issues arising
from the facts."). This article requires the defendant to "distinctly specify" the ground-or basis-of
his objection to the charge and the ground-or basis-for any requested instructions that arise from the
facts in evidence. See Williams, 930 S.W.2d at 903.
54. See, e.g., Wood v. State, 18 S.W.3d 642, 649 n.6 (Tex. Crim. App. 2000).
55. See Tex. Penal Code § 9.22 (Necessity) ("Conduct is justified if the actor reasonably
believes the conduct is immediately necessary to avoid imminent harm . . . ."); id. § 9.31 (Self-Defense) ("a person is justified in using force against another when and to the degree the actor
reasonably believes the force is immediately necessary . . . ."); id. § 9.32 (Deadly force in defense
of a person) ("A person is justified in using deadly force against another . . . when and to the degree
the actor reasonably believes the deadly force is immediately necessary . . . ."); id. § 9.33 (Defense
of third person) ("A person is justified in using force or deadly force against another to protect a third
person if, under the circumstances as the actor reasonably believes them to be . . . ."); id. § 9.41
(Protection of one's own property) ("A person in lawful possession of land or tangible, movable
property is justified in using force against another when and to the degree the actor reasonably
believes the force is immediately necessary . . . .").
56. Tex. Penal Code § 8.01 ("It is an affirmative defense to prosecution that, at the time of
the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his
conduct was wrong.").
57. See Jackson v. State, 160 S.W.3d 568, 572 (Tex. Crim. App. 2005) ("Texas law does not
recognize a lesser form of the insanity affirmative defense."). Appellant attempts to analogize his
case to Darty v. State, 994 S.W.2d 215 (Tex. App.--San Antonio 1999, no pet.). In that case, the
defendant testified that, during a traffic stop, the policeman threw him on his neighbor's car, beat
him with his flashlight, and placed him in a choke hold. Id. at 218. The defendant denied kicking
the officer, but admitted that he used some force to escape the chokehold because he could not
breathe. Id. An ordinary and prudent person in the same situation might have thought this use of
force was reasonable. But there was no evidence in Darty that the defendant was psychotic or
paranoid or otherwise acting under unreasonable delusions of persecution. 

 The present case is analogous to the situation in Zwack v. State, 757 S.W.2d 66 (Tex.
App.--Houston [14th Dist.] 1988, pet. ref'd), in which the court of appeals held that the
defendant-who claimed that he had paranoia and delusions of persecution-was not entitled to an
instruction on self-defense. In Zwack, the defendant was charged with attempted capital murder of
a police officer for shooting the officer who had pulled his truck over. Zwack entered a plea of
insanity but also requested a jury charge on "self defense based on an insane delusion." The court
of appeals noted, "There was strong evidence that Appellant was suffering under a paranoid delusion
that he was being 'ambushed' by police officers who intended to kill him," rather than simply arrest
him. Id. at 70. But, as the court noted, even if the circumstances as perceived by the defendant were
true, he would not be entitled to a self-defense instruction because he had failed to offer any evidence
that his use of force was justified, a "reasonable person" would not have retreated, and the deadly
force was immediately necessary to protect the defendant from the other's use of unlawful deadly
force. Id. The same is true here: appellant's use of force was not justified; a "reasonable person"
would have retreated (or surrendered); and the officers did not initially use unlawful deadly force
against him. See Tex. Penal Code § 9.31.
58. Appellant's Brief at 64-68.
59. See Giesberg v. State, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) ("[B]ecause the
authority to establish what constitutes a defense rests solely with the Legislature, this Court
concludes a defense which is not recognized by the Legislature as either a defense or as an
affirmative defense does not warrant a separate instruction."); Willis v. State, 790 S.W.2d 307, 314
(Tex. Crim. App. 1990).
60. See Saunders v. State, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).
61. Appellant's Brief at 80.
62. Id. at 82.
63. See Cook v. State, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994).
64. See Hampton v. State, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003) (before one is entitled
to an instruction on a lesser-included offense, there must be "affirmative" evidence "directly
germane" to the existence of the lesser-included offense).
65. See Burnett v. State, 865 S.W.2d 223, 229 (Tex. App.--San Antonio 1993, pet. ref'd). In
Burnett, the court of appeals explained,

 for a defendant to be entitled to a jury charge on involuntary manslaughter or
criminally negligent homicide, the record must contain "some" evidence that the
defendant did not intend the resulting death or know that it was reasonably certain
to occur. If such evidence is present, the record must then be examined to see if it
indicates whether the defendant was aware or unaware of the risk that his conduct
could result in the unintentional killing of the deceased.

Id.
66. Appellant's Brief at 75.
67. In the 1994 Penal Code revisions, the Texas Legislature repealed the former voluntary
manslaughter statute and made sudden passion an issue to be considered at the punishment stage of
a murder trial. See Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). But evidence of
"sudden passion" or provocation is admissible and relevant to the mitigation issue. See Wesbrook
v. State, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000) ("The Legislature, through its broad power to
classify crimes and those who stand accused of crimes, chose not to permit the defense of "sudden
passion" in the context of capital murder"; stating that "the issue of 'sudden passion' could be
considered only as a mitigating circumstance for the jury when deciding the second punishment
issue.").
68. 29 S.W. 782 (Tex. Crim. App. 1895).
69. 77 S.W. 813 (Tex. Crim. App. 1903).
70. Appellant's Brief at 75.
71. See Larson, 29 S.W. at 783 (holding that "it has been held by this court that the adequate
causes laid down in the statutes to create such passion . . .") (emphasis added); Vann, 77 S.W. at 816
("Appellant contends, and we think correctly, that he had the right to have a charge on manslaughter,
unfettered by a charge on provocation with the apparent intention to kill; and also that, under the law
and the facts, he was entitled to a clear and unequivocal charge on self-defense, unlimited by the law
in regard to provoking a difficulty.") (emphasis added).
72. See Wesbrook, 29 S.W.3d at 112-13 ("The Legislature is vested with the lawmaking power
of the people in that it alone '
may define crimes and prescribe penalties.' . . . The Legislature,
through its broad power to classify crimes and those who stand accused of crimes, chose not to
permit the defense of "sudden passion" in the context of capital murder.").
73. See Tex. R. App. P. 33.1(a)(1); see also Curry v. State, 910 S.W.2d 490, 496 (Tex. Crim.
App. 1995) (appellant waived his challenge to statute as vague as applied because he did not
specifically object at trial).
74. 744 S.W.2d 15 (Tex. Crim. App. 1987), overruled on other grounds, Cockrell v. State, 933
S.W.2d 73 (Tex. Crim. App. 1996).
75. Id. at 29; see also Hughes v. State, 897 S.W.2d 285, 297-98 (Tex. Crim. App. 1994);
Guerra v. State, 771 S.W.2d 453, 460-61 (Tex. Crim. App. 1988).
76. Hall v. State, 158 S.W.3d 470, 474 (Tex. Crim. App. 2005).
77. See Daniels v. State, 754 S.W.2d 214, 219 (Tex. Crim. App. 1988) (noting that, when
words are not defined, they are ordinarily given their plain meaning unless the statute clearly shows
that they were used in some other sense); Ely v. State, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979)
(stating that, in the absence of special definitions, statutory language under attack as vague can be
measured by common understanding and practices or construed in the sense generally understood).
78. 152 S.W.3d 105, 115 (Tex. Crim. App. 2004); see also Ochoa v. State, 119 S.W.3d 825, 
828-29 (Tex. App.--San Antonio 2003, no pet.) (collecting Texas cases holding that giving an
instruction regarding "all possible doubt" is not error).
79. 511 U.S. 1 (1994).
80. Id. at 5.
81. See Paulson v. State, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000) (citing Victor and noting
that "the better practice is to give no definition of reasonable doubt at all to the jury"). 
82. In this point of error, appellant devotes much of his discussion to purported constitutional
deficiencies in the future-dangerousness special issue. To the extent that appellant raises matters
other than the legal sufficiency of the evidence to support the first special issue, we find this point
of error multifarious and decline to address those matters. See Wood v. State, 18 S.W.3d 642, 649
n.6 (Tex. Crim. App. 2000). Further, arguments similar to those made by appellant were recently
rejected in Russeau v. State, 291 S.W.3d 426, 433-34 (Tex. Crim. App. 2009). 
83. See Keeton v. State, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). Among those factors are:
(1) the circumstances of the capital offense, including the defendant's state of mind and whether he
was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the
forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior
criminal record, and the severity of the prior crimes; (5) the defendant's age and personal
circumstances at the time of the offense; (6) whether the defendant was acting under duress or the
domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence.
Id. It is frequently said that "the circumstances of the offense itself 'can be among the most
revealing evidence of future dangerousness and alone may be sufficient to support an affirmative
answer to that special issue.'" Druery v. State, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007).
84. See, e.g., Williams v. State, 270 S.W.3d 112, 138 (Tex. Crim. App. 2008) (a jury could
reasonably reject the defendant's claim that the commission of capital offense was merely a
temporary departure from his usual "benign" crimes and find that he was incorrigible).
85. Appellant's requested instructions were as follows:


 "That its consideration of victim impact evidence should not be conducted in connection
with the future dangerousness issue";


(2) "That its consideration of victim impact evidence did not relieve the state of its burden to
prove the 'future dangerousness' special issue beyond a reasonable doubt";

(3) "To disregard victim impact evidence that was not shown to be within the knowledge or
reasonable expectation of the defendant";

(4) "Not to make a comparative worth analysis of the value of the victims to their families and
community compared to the defendant or other members of society."
86. 983 S.W.2d 249 (Tex. Crim. App. 1998).
87. Id. at 263.
88. Id. at 262.
89. 232 S.W.3d 77, 106 (Tex. Crim. App. 2007).
90. Id. 
91. Id. at 107 (citing Cockrell v. State, 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996) (footnote
omitted)).
92. See Tex. R. Evid. 105; see Guevara v. State, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003)
(defendant failed to preserve any error regarding admission of victim-impact evidence because his
objection at trial did not comport with complaint raised on appeal); 
James v. State, 772 S.W.2d 84,
101 (Tex. Crim. App. 1989), vacated on other grounds, 493 U.S. 885 (1989) (failure to object to
victim-impact evidence waived review on appeal); Barletta v. State, 994 S.W.2d 708, 715 (Tex.
App.--Texarkana 1999, pet. ref'd) (defendant's claim of erroneous admission of victim-impact
testimony was not preserved for appellate review).
93. Mosley, 983 S.W.2d at 262.
94. Haley v. State, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005).
95. Williams, 273 S.W.3d at 220.
96. Salazar v. State, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002).
97. 939 S.W.2d 627, 637 (Tex. Crim. App. 1997).
98. Id.
99. Ford v. State, 919 S.W.2d 107, 116 (Tex. Crim. App. 1996); Garcia v. State, 126 S.W.3d
921, 929 (Tex. Crim. App. 2004) (medical records of injured bystander admissible over 'victim
impact' objection; "While the records might have been irrelevant or inadmissible for other reasons,
they were not irrelevant or inadmissible because they were victim impact evidence, as appellant
claims").
100. See Roberts v. State, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) ("'Victim impact'
evidence is evidence of the effect of an offense on people other than the victim"; stating that
"evidence of the effect of a different offense on the victim" is admissible); compare Haley, 173
S.W.3d at 518 (trial court erred in admitting victim-impact evidence relating to the extraneous
offense of murder in the punishment phase of cocaine possession trial.).
101. The prosecutor argued, inter alia,

 And this defendant, we know, gets violent under these circumstances. The Defense's
own experts told you that they had concerns about this defendant because of the
conditions they believe he's suffering from.

 If you believe he's paranoid and he believes that the guards are out to get him
or the police officers are out to get him or just that people are out to get him, then,
clearly, there's a risk of violence. There's a risk that he is going to act on those
impulses. . . .
102. See Clark v. State, 881 S.W.2d 682, 699 (Tex. Crim. App. 1994) (rejecting defendant's
claim that evidence of childhood abuse was "'mandatorily mitigating.' Rather than mandating that
certain evidence be considered mitigating, the sentencer must simply be allowed to fully consider
and give effect to the evidence.").
103. Tex. R. App. P. 33.1; see Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)
("a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse
ruling his objection to a jury argument forfeits his right to complain about the argument on appeal. 
Any prior cases to the contrary such as Montoya and Romo are expressly overruled."); see also
Threadgill v. State, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (reaffirming the Cockrell rule).
104. Appellant argues that one or more of his written objections to the charge should have
alerted the trial judge to this omission, but nowhere in his laundry list of objections did appellant 
object to the omission of the language mandated by Tex. Code Crim. Proc. art. 37.071, §2(f)(3) (the
trial judge shall instruct the jurors that, in answering the mitigation question, they "need not agree
on what particular evidence supports an affirmative finding on that issue"). And none of his
objections were likely to put the trial court on notice of his actual complaint. His objections
included: "The Defendant objects to the punishment charge as a whole because it fails to provide a
vehicle for full and fair consideration of mitigating circumstances, rather than just some
consideration," as well as general objections to the constitutionality of article 37.071 and the failure
to instruct the jury that a single "holdout" juror could ensure a life sentence.
105. Almanza v. State, 686 S.W.2d 157 (Tex. Crim. App. 1985).
106. 283 S.W.3d 854 (Tex. Crim. App. 2009).
107. Id. at 879.
108. Id. at 879.
109. See id. at 882 (Cochran, J., concurring) ("[I]t would be illogical to speculate that perhaps
one or more of those jurors did find a mitigating circumstance but was so confused about the
unanimity requirement that he thought that unless every juror agreed upon the same mitigating fact,
his vote did not count. So he changed his vote. Such reasoning assumes that jurors would violate
their oaths. We must, however, '
presume[ ] that jurors, conscious of the gravity of their tasks, attend
closely the particular language of the trial court's instructions in criminal cases and strive to
understand, make sense of, and follow the instructions given them.'") (footnote omitted).
110. Appellant's Brief at 47. Appellant set out the prosecutor's offending argument as follows:

 Remember the testimony of [four of appellant's character witnesses]? That
he's a nice guy. He's good with kids. He's good with animals. He's apparently the
friendliest, most trusting guy they've ever met.

 And yet on the other hand, the Defense wants you to believe that he's some
sort of paranoid psychotic. They can't have it both ways. You can't just throw all
the defenses against the wall and see what sticks. There has to be-there has to be a
theory here.

 If you're going to find that there's a mitigating circumstance to justify that the
defendant doesn't receive the just punishment that he deserves, then, surely, the
evidence should all show you that.

 You consider all the evidence. You don't just pick out the half of the
evidence that you want.

Appellant points to other portions of the closing argument in which the prosecutor listed different
mitigation theories that the defense had presented and stated, "All of those things are issues that he's
just throwing up there, hoping that one of those, you're going to grasp a hold of and determine that's
some sort of mitigating evidence."
111. Of course, as the defense implied, they are not necessarily inconsistent. Witness Dr. Jekyll
and Mr. Hyde.
112. Young, 283 S.W.3d at 878-79.
113. See generally Powell v. State, 897 S.W.2d 307, 314 (Tex. Crim. App. 1994) (discussing
1991 legislative changes to art. 37.071).
114. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).
115. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1); see Sonnier v. Quarterman, 476 F.3d 349,
367 (5th Cir. 2007) ("Though the 'deliberateness' special issue has been removed, the imposition
of the death penalty under the amended article is not arbitrary, erratic, wanton, or freakish."); Joiner
v. State, 825 S.W.2d 701, 704 (Tex. Crim. App. 1992) (in answering the "future dangerousness"
special issue, the jury may consider, inter alia, "the calculated nature of the defendant's acts," "the
forethought and deliberateness exhibited by the crime's execution," and "whether the defendant was
acting under duress or the domination of another at the time of the offense").
116. Tex. Code Crim. Proc. art. 37.071, §2(f)(4).
117. See Cantu v. State, 939 S.W.2d 627, 649 (Tex. Crim. App. 1997) ("Because the
consideration and weighing of mitigating evidence is an open-ended, subjective determination
engaged in by each individual juror, we conclude that Article 37.071 §2(f)(4) does not
unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness");
see also Prystash v. State, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999); Jackson v. State, 992 S.W.2d
469, 481 (Tex. Crim. App. 1999).
118. See, e.g., Ladd v. State, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999) (trial court need
not further define the terms in the "future dangerousness" issue because the jury is presumed to
understand them); see also Russeau v. State, 291 S.W.3d 426, 434 (Tex. Crim. App. 2009); Renteria
v. State, 206 S.W.3d 689, 706 (Tex. Crim. App. 2006).
119. Smith v. Texas, 543 U.S. 37, 45 (2004).
120. Johnson v. Texas, 509 U.S. 350, 362-63 (1993).
121. On appeal, he points to his charge objections 16 and 17, which deal with the trial court's
failure to define certain terms; they do not deal with the specific issue that he presents on appeal.
122. Almanza, 686 S.W.2d at 171.
123. See, e.g., Russeau v. State, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); Shannon v.
State, 942 S.W.2d 591, 600-01 (Tex. Crim. App. 1996).
124. Appellant's Brief at 128.
125. See Luna v. State, 268 S.W.3d 594, 609-10 (Tex. Crim. App. 2008), cert. denied, 130
S.Ct. 72 (2009); Scheanette v. State, 144 S.W.3d 503, 507-08 (Tex. Crim. App. 2004).
126. Whitaker v. State, 286 S.W.3d 355, 370 (Tex. Crim. App. 2009); Busby v. State, 253
S.W.3d 661, 667 (Tex. Crim. App. 2008).