Kyle Brian ZWACK, Appellant,

v.

The STATE of Texas, Appellee.

No. A14–87–00427–CR.

Court of Appeals of Texas, Houston (14th Dist.).

July 28, 1988.

Allen C. Isbell, Houston, for appellant.

Timothy G. Taft, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY and ROBERTSON, JJ.

## OPINION

ROBERTSON, Justice.

The jury rejected appellant's not guilty plea to attempted capital murder of a peace officer and assessed his punishment at confinement for 45 years. Issues on appeal concern the refusal to permit appellant to read portions of a learned treatise into evidence, the constitutionality of the provision which prohibits informing the jury of the effect of a verdict of not guilty by reason of insanity, denial of a requested instruction on self-defense and whether error was committed in charging on the parole laws. We affirm.

Appellant does not challenge the sufficiency of the evidence. It will be briefly summarized only as necessary to a discussion of the issues.

 In his first point of error appellant contends the trial court erred in refusing to permit his counsel to read portions of the book, H. CAPLAND & B. SADDOCK, MODERN SYNOPSIS, A COMPREHENSIVE TEXTBOOK OF PSYCHIATRY (4th ed.). Appellant's defense was insanity. A psychiatrist and a clinical psychologist, called by appellant, testified that from their examinations they concluded appellant was suffering from paranoia and the psychologist additionally concluded appellant was "borderline schizophrenic." A psychiatrist and a psychologist called by the state testified that they found no evidence of a major mental illness from which appellant was suffering and that he was legally sane. On direct examination of his two experts and on cross-examination of the state's two experts, appellant established that each was familiar with the book in question and that it was recognized as authoritative in the field of psychiatry; however, none of the witnesses were then questioned as to the contents of the work. After the state rested, appellant sought to read portions of the book to the jury, stating that "it's my opinion that I do it now after I have had each witness identify it as authoritative." The trial court denied appellant's request. While during appellant's argument to the trial court he stated that he "would ask leave to recall the witness and do it with the witness sitting there,"

this request was not pursued and is thus not before us. Thus the issue is simply whether either side may read as substantive evidence, under the facts as presented here, excerpts from a learned treatise. We hold they may not.

Prior to the adoption of the new rules of evidence, it was well-established that standard medical texts could not be introduced as direct evidence but could only be used to discredit or test the weight of the testimony of the expert if he stated he recognized the text as standard authority. *Aliff v. State*, 627 S.W.2d 166, 170 (Tex.Crim.App. 1982); *Long v. State*, 649 S.W.2d 363, 364–65 (Tex.App.—Fort Worth 1983, pet. ref'd); *Seeley v. Eaton*, 506 S.W.2d 719, 723 (Tex. Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.). TEX.R.CRIM.EVID. 803(18) changed this rule. It excludes from the rule against hearsay learned treatises

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

In commenting on this new rule Professor Wellborn stated:

> An important feature of rule 803(18) is that, unlike the earlier Model Code and Uniform Rules, the federal and Texas provisions permit learned publications to be used only in conjunction with testimony by an expert witness, either on direct or cross-examination—even when the authority of the publication is otherwise established. The reason for this limitation is to ensure that a jury will not receive arcane information without some guidance from a live witness. Consequently, it would not be proper under the new rule for an attorney to read into evidence from a publication, however fully authenticated and established as authoritative, except while examining an expert witness.

Wellborn, *Article VIII: Hearsay,* 20 HOUS. L.REV. 477, 526–27 (1983). (citations omitted).

▮ While Rule 803(18) has not yet been interpreted by a Texas court, it has been in issue in several federal courts. In *Tart v. McGann,* 697 F.2d 75 (2d Cir.1982), the change in the rule was discussed:

> Prior to the enactment of Rule 803(18), learned treatises were generally usable only on cross-examination, and then only for impeachment purposes. See Weinstein, supra, 803(18)[01]. Most commentators found the hearsay objections to learned treatise evidence unconvincing, and recommended that treatises be admitted as substantive evidence. Some commentators went so far as to suggest that treatises be admitted independently of an expert's testimony. Id. 803(18)[02]. The Advisory Committee rejected this position, noting that a treatise might be "misunderstood and misapplied without expert assistance and supervision." FED. R.EVID. 803(18) advisory committee notes. Accordingly, the Rule permits the admission of learned treatises as substantive evidence, but only when "an expert is on the stand and available to explain and assist in the application of the treatise...." Id.

*Tart,* 697 F.2d at 78. The first circuit rejected the argument "that the contents of all issues of a periodical may be qualified wholesale under Rule 803(18) by testimony that the magazine was highly regarded" in *Meschino v. North Am. Drager, Inc.,* 841 F.2d 429, 434 (1st Cir.1988). And our own circuit used the following language in *Dartez v. Fibreboard Corp.,* 765 F.2d 456 (5th Cir.1985):

> The reason for the Rule's restrictions on the use of learned treatises is to avoid the possibility that the jury will misunderstand and misapply the technical language within such an article if they are allowed to consider the publication itself instead of receiving the information through the testimony of an expert in the field. Fed.R.Evid. 803(18) advisory committee note.

*Dartez,* 765 F.2d at 465. We agree with the above interpretations and hold that learned treatises are to be used only in conjunction with testimony by an expert witness, either on direct or cross-examination, even though the authority of the publication is otherwise established. Appellant's first point of error is overruled.

In his second point of error appellant attacks the constitutionality of that portion of the statute which prohibits informing the jury of the consequences of a verdict of not guilty by reason of insanity when insanity is relied upon as a defense to a criminal charge. In point three he complains of the exclusion of evidence of those consequences, and in the fourth point he complains of the failure of the trial court to answer an inquiry from the jury as to the consequences.

TEX.CRIM.PROC.CODE ANN. art. 46.03, § 1(e) (Vernon Supp.1988) prohibits the court, the prosecutor and defense counsel from informing a juror or prospective juror of the consequences to the accused if a verdict of not guilty by reason of insanity is returned. Appellant argues the statute denied him fundamental fairness and urges us to adopt the reasoning of the court in *Lyles v. United States,* 254 F.2d 725 (D.C. Cir.1957), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). He further argues his contention merits "further discussion and analysis than in the opinions reported from our appellate courts." We disagree.

First, we cannot discern any constitutional infirmity in the statute and appellant has not supported his contention with convincing argument. Second, Texas courts have consistently held that the statutes prescribing the disposition of one found not guilty by reason of insanity are a guideline for the court and not for the jury's consideration. *Granviel v. State,* 552 S.W.2d 107, 122 (Tex.Crim.App.1976); *Holder v. State,* 643 S.W.2d 718, 721 (Tex.Crim.App.1982); *Belachheb v. State,* 699 S.W.2d 709 (Tex. App.—Fort Worth 1985, pet. ref'd); *Heflin v. State,* 640 S.W.2d 58, 60 (Tex.App.—Austin 1982, pet. ref'd); *Finch v. State,* 638 S.W.2d 215, 217–18 (Tex.App.—Fort Worth), *pet. dism'd per curiam,* 643 S.W.2d 415 (Tex.Crim.App.1982). It was not until 1983 that the legislature specifically added the provision of which complaint is here made. Act of Aug. 29, 1983, ch. 454, §§ 2, 3, 1983 Tex.Sess.Law Serv. 2640 (Vernon). Third, the rule announced by the District of Columbia Circuit Court of Appeals in *Lyles* was not based upon constitutional principles but upon its rule-making authority. *See also United States v. Alvarez,* 519 F.2d 1036, 1047–48 (3d Cir. 1975); *United States v. McCracken,* 488 F.2d 406, 422–23 (5th Cir.1974); *Apgar v. United States,* 440 F.2d 733, 737 (8th Cir. 1971). We agree with the state that appellant's public policy argument should be addressed to the legislature. Appellant's second through fourth points of error are overruled.

In his fifth point of error appellant contends the trial court erred "in denying appellant's requested instruction on self-defense which incorporated the factor of insane delusion because there was sufficient evidence to raise this defensive theory." Appellant did not testify and the facts surrounding the commission of the offense are not disputed. Briefly stated some five days previous to this offense appellant was convicted of aggravated assault and placed on probation. A federal agent, acting on information that appellant was in possession of a prohibited weapon, was observing appellant and saw him leave his residence. The officer was in an unmarked automobile and he called for assistance from a local police unit. A local Hedwig Village police officer, Fulgham, in a marked patrol unit, and a motorcycle unit responded. Officer Fulgham pulled in behind appellant and turned on his emergency equipment and appellant pulled over. Appellant immediately got out of his pick-up and opened fire with his rapid-fire automatic (shooting twenty-seven rounds in a matter of seconds), hitting Officer Fulgham. Appellant then left the scene, pursued by the officers, and was captured shortly thereafter when he ran a red light and ran into two other cars. As previously stated appellant did not testify, but numerous statements attributed to appellant and used by his medi-

cal experts in support of their opinion that appellant was insane were before the jury. We quote the following from appellant's brief:

There was strong evidence that Appellant was suffering under a paranoid delusion that he was being "ambushed" by police officers who intended to kill him. Dr. Richard Barrett diagnosed Appellant as suffering from paranonia [sic] and schizophrenia. Evidence supporting this diagnosis included: (1) the appellant's claim that when he was arrested in Minnesota, the police intimidated him, beat him and forced him to drink from a toilet; (2) that appellant bought a gun to defend himself, stating that if he were wrongfully assaulted by someone, it would be his right to defend himself and kill that person. When questioned whether he may make a mistake and kill an innocent person, he related that law enforcement officials do this all the time and that it was within his right to make such a mistake; (3) that appellant felt that most police officers, if not all, are corrupt. Once, he respected them highly, but he began seeing more and more evidence that they were corrupt. When the very people whom he had seen as upstanding in society and protecting him were no longer there to protect him, he felt very, very vulnerable, scared and then angry at them; that Appellant's thinking on this matter was a delusion; (4) that Appellant wrote an article entitled *American Pseudo Hero's*, stating his fear that all policemen shoot to kill with no provocation and describing very graphically how victimized he felt.

His delusions made him believe he had the right to use lethal force to prevent police from kidnapping him. At the time of the shooting, appellant believed he was going to be shot, not arrested; that his life was in danger. Appellant's statement indicates that he had been wearing a bullet proof vest for four days and was terrified that the police were going to kill him. Appellant's insane delusion was that he was being surrounded and "ambushed" by the police, whom he believed "shoot to kill" innocent people. He did

not perceive that he was being "arrested". (citations to record omitted).

At trial, as a part of appellant's observations about the charge, he stated:

MR. ACKERMAN: The other thing that I offered, Your Honor, that is not in the instructions is beginning on Page 3 and continuing through Page—two-thirds of Page 5 is an instruction on self-defense. The evidence—there is evidence before the Court, Your Honor, upon which the jury can find that the defendant was acting under the delusive belief that those police officers were coming to kill him and that he had to respond the way he did to defend himself from a deadly attack by the police officers, and I think with evidence in the record from which the jury could make that finding, that I am entitled to that instruction.

While this is far from a model objection or requested instruction we have decided to consider appellant's objection on the merits because it seems clear the trial court understood the contention that he now asserts.

Appellant argues that "[o]nce the court concluded that the facts as presented at trial were sufficient to raise the issue that appellant was suffering under an insane delusion, it was required to submit a general charge on insanity to the jury. In addition if the circumstances as perceived by the defendant were true and would constitute a defense to the crime charged, the Court was required to submit an additional instruction to the judge [sic] on self defense based on an insane delusion." (citations omitted). While we do not totally agree with all of the above statement, we will accept it as true for the purpose of a discussion of appellant's contention. What appellant overlooks, however, is that *even if the circumstances as perceived by appellant were true*, they would not constitute a defense to the crime. Section 9.31 of the penal code provides that the use of force is not justified to resist an arrest that the actor knows is being made by a peace officer, even though the arrest is unlawful, unless:

(1) if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and

(2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.

(d) The use of deadly force is not justified under this subchapter except as provided in Sections 9.32, ... of this code.

TEX.PENAL CODE ANN. § 9.31 (Vernon 1974). Section 9.32 provides that deadly force, such as that used by appellant, cannot be used unless: (1) the use of force was justified; (2) a reasonable person would not have retreated; and (3) deadly force is immediately necessary to either protect himself from the other's use of unlawful deadly force or to prevent the other's imminent commission of, among other things, murder. There simply is no evidence raising the issue of self-defense, even when the evidence and the law is viewed as interpreted by appellant. Appellant's fifth point of error is overruled.

■ In his sixth through tenth points of error appellant contends that TEX.CRIM. PROC.CODE ANN. art. 37.07, § 4 (Vernon Supp.1988) is unconstitutional and that the trial court erred in instructing the jury, over his objection, on the parole laws. On motion for rehearing, a majority of the court of criminal appeals has now agreed that art. 37.07, § 4(a) is unconstitutional because it violates the separation of powers and the due course of law provisions of the Texas Constitution. *Rose v. State*, 752 S.W.2d 529 (Tex.Crim.App., 1988) (opinion on rehearing). A majority of the court also agreed that whether harm resulted from the court's instruction on the parole law would be tested under the harm analysis contained in TEX.R.APP.P. 81(b)(2). When applying *Rose* and rule 81(b)(2) to this case, we find that as in *Rose*, the trial court gave the following additional instruction to the jury at the punishment phase after he had given the complained-of parole instruction:

You are not to discuss among yourselves how long the accused would be required to serve the sentence that you impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor of the State of Texas, and must not be considered by you.

The court of criminal appeals found this to be "particularly significant."

In this case, appellant filed a motion for new trial, and among other grounds, alleged the error in giving the parole instruction. He attached to the motion a statement of the juror Smith. The statement was acknowledged, rather than sworn to, before a notary. Concerning the issue before us the statement said:

3. That prior to such deliberation the jury was instructed by the Court that a defendant would become eligible for parole after having served one-third of his sentence. After telling us about the parole laws the Court then told us that those issues were within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor, and were not to be considered by us. We were further instructed by the Court that we were not to discuss how long a defendant would be required to serve on the sentence imposed.

4. Once we were told about the parole laws it was impossible to ignore that information and it played a part in our arriving at the 45-year sentence which we imposed upon the defendant.

The state filed an answer to appellant's motion for new trial and attached to it a statement from seven of the jurors, including the juror Smith. Like appellant's statement, each of the controverting statements were acknowledged before a notary rather than sworn. Juror Smith, in her statement attached to the state's answer, stated:

That they arrived at the 45 years verdict by starting at the highest and lowest recommendation of jurors. That they discussed years in between the highest and lowest numbers till they reached a number of years each could live with.

That she knew that it was possible that the Defendant might have to serve 45 years.

That the 45 years was arrived at based on the seriousness of the offense.

That they did not give a greater number of years than they felt the Defendant deserved based upon knowing the parole laws and out of fear the Defendant might be an early parolee.

That knowing the parole laws did not cause them to increase the Defendant's punishment.

Each of the other statements reflected that the jurors considered the instruction concerning the parole law was confusing but each asserted that the term of 45 years was agreed upon as the amount of time the jury desired appellant to serve and some of them stated that they "did not give a more severe number of years out of fear he might be paroled early."

Without any challenge by the state to the sufficiency of the grounds of the motion for new trial under TEX.R.APP.P. 30 or the propriety of inquiring into any alleged misconduct by the jury without an affidavit of a juror, the trial court held a hearing at which five of the jurors testified. Juror Rueda stated that some of the jurors wanted to assess more than 45 years and some wanted to assess less, and through "bargaining" they finally agreed upon the 45 years which is what he wanted appellant to have to actually serve. He acknowledged there was some discussion about the parole laws but the instructions they received from the court appeared to be contradictory. On cross-examination by the state the juror was adamant that the instructions on the parole laws did not cause him to give appellant a greater sentence than he would have given had he not known about them. He further stated "I gave 45 years because I've had to come down to the number of years I wanted to give. I was not thinking about parole at all."

Juror Schlather testified that there was some discussion of the parole laws as contained in the court's charge and that when they assessed the punishment at 45 years he understood that appellant "could be paroled in 15 years" but it was his intention that appellant remain in prison for the full 45 years. On cross-examination by the state the juror stated that the discussion about the parole laws occurred after the jury had agreed upon the 45 years. He also emphatically stated that knowing about the parole laws did not cause him to give appellant a greater sentence than he would have without knowing about them.

The testimony of jurors Lawyer, Sandoval and Smith was essentially the same. Each acknowledged there was some discussion of the parole laws but stated that in assessing the 45 years it was their intent that appellant remain in prison for the full time. Likewise, on cross-examination each juror stated that knowing about the possibility of parole did not cause him or her to assess a greater punishment than he otherwise would have.

Unlike in *Rose* where the court stated "we are unable to know what process the jury underwent in assessing punishment," in this case the record affirmatively shows that they did not give consideration to the parole instruction. In this state of the record it is clear beyond a reasonable doubt that the error in giving the instruction on parole made no contribution to the punishment assessed. TEX.R.APP.P. 81(b)(2). Appellant's points of error six through ten are overruled.

The judgment is affirmed.