In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00122-CR
_____

SALVADOR GARZA JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 20-09-10542-CR

**MEMORANDUM OPINION**

A grand jury indicted Salvador Garza Jr. ("Garza") for the offense of sexual assault of a child, a second-degree felony punishable by two to twenty years imprisonment and a fine not exceeding $10,000. *See* Tex. Penal Code Ann. §§ 12.33, 22.011(a)(2)(A), (f). Garza waived his right to a jury trial, and in an open plea to the trial court, Garza pleaded guilty to the offense charged. The trial court found Garza guilty and scheduled a sentencing hearing approximately two months after the plea

hearing to allow time for the State to complete a pre-sentence investigation. After considering evidence from the State and Garza, the trial court sentenced Garza to ten years in the Institutional Division of the Texas Department of Criminal Justice.

The trial court certified Garza's right to appeal his sentence only. He now appeals his sentence, arguing 1) that he should be resentenced, and 2) that his conviction and sentence should be reversed and the matter remanded for a new trial because "[t]he trial court did not afford [Garza] consideration for cooperating when sentencing him, thus violating his fundamental right to a fair judicial process." He contends that the trial court "must provide an articulable benefit of what the defendant received in exchange for the plea." Garza does not argue that the sentence violated a plea bargain agreement for a specific or a maximum sentence.

For the reasons discussed below, we will affirm the trial court's judgment.

## I. Background

### A. The Offense

During the summer of 2020, "Kylie" was staying with her Aunt in the Houston area.[1] Kylie was a member of Garza's extended family, and was then sixteen years

---

[1]We use pseudonyms to refer to the victim, a minor, and we refer to her family members other than Garza by their relationship to the victim to protect the victim's privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

old, while Garza was in his forties. Garza and his parents also lived in the Aunt's home, as did the Aunt's minor children.

One evening in August, after Garza had been drinking, he and Kylie were sitting outside in folding lawn chairs. When Kylie stood up, Garza grabbed her and sat her on his lap. He then sexually assaulted her by inserting his finger into her vagina.

The indictment alleged that Garza, "on or about August 23, 2020, and before the presentment of this indictment, . . . did then and there intentionally or knowingly cause the defendant's finger to penetrate the sexual organ of K.G., a child."

## B. The Guilty Plea

Garza signed the Admonitions to the Defendant for Plea to the Court, and Supplemental Admonitions to the Defendant for Sex Offender Registration Requirements, which reflect his understanding that he was pleading guilty to a second-degree felony with a penalty range of two to twenty years in prison and a fine not to exceed $10,000. These admonitions further apprised Garza of his responsibility to register as a sex offender. *See* Tex. Code Crim. Proc. Ann. art. 62.051(a) (requiring sex offender registration for certain offenses).

At the plea hearing, the trial court indicated there was not an agreed sentencing, and Garza would be entering an "open plea." The trial court then

admonished Garza as required by the Texas Code of Criminal Procedure and inquired into Garza's mental competence to plead guilty as well as the voluntariness of his plea. *See id.* art. 26.13(a), (b) (outlining required court admonishments before accepting a guilty plea). The following exchanges took place between Garza and the trial court:

> THE COURT: Sir, you were charged with the offense of sexual assault of a child. And that is a second-degree felony, which means it carries a punishment range of not less than two years and not more than 20 years in the Institutional Division of the Texas Department of Criminal Justice and in addition, a fine not to exceed $10,000 may be assessed. Do you understand that?
>
> A. Yes, ma'am.
>
> Q. Are you a citizen of the United States?
>
> A. I am.
>
> Q. Do you read, write and speak the English language?
>
> A. I do.
>
> Q. Are you able to hear what I'm saying?
>
> A. Yes, ma'am.
>
> Q. I have before me admonishments, statements, and waivers which seem to have your signature on the second page. Is this your signature?
>
> A. It is.
>
> Q. Did you sign this document?

A. Yes, I did.

Q. Before you signed it, did you read and discuss it with your attorney?

A. We did.

Q. Did you understand everything you read and discussed?

A. Yes, ma'am.

Q. Have you ever been found incompetent by a court of law?

A. No, ma'am. No.

Q. Has a doctor ever said that you had mental health problems?

A. No, ma'am.

Q. Okay.

. . .

Q. Mr. Garza, I also have State's Exhibit No. 1, a stipulation of evidence, which again appears to have your signature. Is this your signature, sir?

A. Yes, ma'am.

Q. Did you sign this document?

A. Yes, ma'am.

Q. Did you sign it freely and voluntarily?

A. Yes, ma'am.

Q. And is it true and correct? It's your confession actually is what it is.

5

[DEFENSE COUNSEL]: Your statement of guilty.

A. Yes. Yes.

The trial court also asked Garza's counsel whether Garza understood the consequences of the plea or whether counsel had any reason to believe that Garza was not competent, to which counsel replied that Garza did appreciate the consequences of the plea and was not incompetent. In response to questions from his attorney, Garza confirmed that he understood the lifetime requirement to register as a sex offender and the parole law explanation counsel previously provided. Garza also indicated that he was ready to enter a plea and put himself in the judge's hands.

The trial court then asked:

Q. Mr. Garza, how do you plead to the allegation contained in this cause in which you are charged with committing the offense of sexual assault of a child?

A. I plead guilty.

Q. I'm sorry?

A. Guilty.

Q. Has anyone forced you to say that?

A. No, ma'am.

After accepting Garza's plea and finding him guilty, the trial court recessed the proceedings pending the completion of a pre-sentence investigation. We summarize below the evidence presented at Garza's sentencing hearing.

## B. Punishment Hearing

### Kylie's Testimony

At the punishment hearing, Kylie testified regarding the offense and how it impacted her. In remembering the months at her Aunt's home preceding the assault, Kylie recalled that she had a "great" time. Not only did she and her relatives, including Garza, go to the park, the lake, the beach, ride bicycles, take walks, and work out together, Garza taught her to drive, and other relatives taught her how to rollerblade. She described conversations she had with Garza throughout the summer.

Kylie then provided detailed testimony about the sexual assault and how it negatively impacted her. By the time of trial, Kylie had improved, due to therapy and her parents, who "didn't let [her] quit anything[,]" and "were there behind – behind [her] through it all." Also, she explained how the assault adversely affected her immediate family's relationship with the extended family, and Kylie characterized the change in her parents' relationship as having gone from "fine before[]" to "unstable."

7

After Kylie and her family arrived home, the Department of Child Protective Services became involved, making home visits and interviewing Kylie to ask whether her parents "had ever done anything to [her] or if they were at fault for any of this." The investigative process was difficult for Kylie because she knew her parents were blameless.

**Father's Testimony**

Kylie's Father testified that before Garza assaulted Kylie, Father and Garza had a "[p]ositive" relationship. Although Father knew that Garza drank "a lot[,]" he did not think Garza had a drinking problem, and never expected Garza to do anything like this.

Father confirmed Kylie's testimony describing how this event has affected the family as a whole and Kylie in particular. Specifically, he testified that since that day, he has rarely seen or spoken to his parents, siblings, or other family members, and that his relationship with his wife has been "rough." Father testified that Kylie appeared to be "getting better," but was still affected by the assault, as indicated by her decision not to visit family members.

**Detective Cantu's Testimony**

Felix Cantu Jr., ("Cantu") testified that he was a detective with the Montgomery County Sheriff's Office, and at the time of trial, he had been assigned

to the Violent Crimes Unit for nearly three years. According to Cantu, although Garza cooperated with law enforcement, Garza initially was reluctant to speak to law enforcement, but then admitted his "mistake" and further "admitted to touching [Kylie] in her vaginal area and having inappropriate contact with her[]" by penetrating her vagina with his finger. However, Garza also told Cantu that Kylie "walked over and sat on his lap[,]" and then "moved over to the center of his kind of, crotch area in between both of his leg[s] and she started to move and rub her buttocks area against his body." Garza "stated that [Kylie] appeared as if she was enjoying herself." In addition, Garza indicated that Kylie instigated the inappropriate contact by taking his hand and "plac[ing] his hand in certain parts of her body[.]" Garza also told Cantu that both he and Kylie had been drinking earlier, and that it was he, and not Kylie, who ended the contact. He further told Cantu that he suggested to Kylie that they take a walk together, but she declined, stating that she was tired. Garza did not indicate to Cantu that Kylie seemed "upset about anything[]" after Garza assaulted her.

**Salvador Garza Jr.'s Testimony**

Garza testified that he grew up in the Valley and attended Southwest Texas State University. As of the time of trial, he worked full time in sales at Rosehill

Palms. If granted probation, he intended to continue working there and believed that he would successfully complete probation, if granted.

Garza admitted to a history of alcohol use, including two arrests for driving while intoxicated, but has no other criminal history. In relating the events of August 22 and 23, 2020, Garza recalled that he was "[d]rinking a lot." Due to the amount of alcohol he had consumed, Garza also did not recall everything that happened that night, but did recall touching Kylie, he "knew it was wrong[,]" and knew that he was at fault.

According to Garza, he has complied with all conditions of bond, including obtaining a drug and alcohol evaluation, attending Alcoholics Anonymous, passing all his drug tests, attending his probation meetings, and refraining from contact with Kylie and her family. He also expressed remorse over his actions, stating that he was "so sorry." Since committing this offense, Garza has thought about it "every day[]" and "every night[,]" and understands what he has done to Kylie and the family.

Although Garza remembered speaking with Detective Cantu, he stated that Cantu confused him, and the events reflected in Cantu's report do not accurately reflect what happened. In particular, Garza testified that contrary to what he apparently told Cantu, as shown in Cantu's report of the interview, Kylie did not

initiate the contact between the two of them and he did not give her any alcoholic beverages or encourage her to drink.

Garza testified that he cooperated with law enforcement's investigation of the offense and voluntarily confessed to the details of it.

**Dr. Aleha Cantu's Testimony**[2]

Aleha Cantu ("Dr. Cantu") testified to her educational qualifications, which include a doctoral degree in clinical psychology with a forensic emphasis. She is a licensed psychologist with professional experience that includes treating sex offenders and evaluating sex offenders' risk for reoffending. Dr. Cantu described sexual risk mitigation broadly as looking at a variety of historical and dynamic factors that research has shown to affect an individual's risk of engaging in sexual misconduct. Dr. Cantu and "many other experts" use a model supported by the American Treatment of Sexual Abuser Community ("ATSAC"). To illustrate this approach to a sex offender's risk of reoffending, Dr. Cantu noted that having a "stable" and "healthy" job would be positive factor.

In this case, Dr. Cantu completed psychological and risk assessments regarding Garza, and she described the process she went through.

---

[2]The record indicates that Dr. Cantu is not related to Detective Cantu.

Dr. Cantu testified that she "typically would provide mitigation evaluations for people who are charged with serious offenses and who would be looking at long sentences, and for whom, typically, the defense would like to highlight possible mitigation to proffer a lower sentence at sentencing." Dr. Cantu outlined information she learned about Garza's background, including his family history, work history, and relationship history.

She testified that Garza reported current use of alcohol and past use of cocaine, marijuana, and Ecstasy. Dr. Cantu therefore considered it important to Garza's success that he refrain from alcohol use. She observed, however, that except one missed test, Garza's PSI showed that he had complied with the terms of his bond, including passing tests for drug and alcohol use. Garza also reported symptoms consistent with intermittent mild depression as a young adult and consistent with depression as of the time of the offense.

For Garza's evaluation, Dr. Cantu used a personality assessment, the MMPI-3, and structured risk assessment tools such as the Static-99R and the Sex Offender Intervention and Progress Scale ("SOTIPS"). Dr. Cantu opined that the Static-99R "may be the most widely used tool for individuals who are charged with sexual offending to look at sexual offending recidivism." Dr. Cantu also reviewed the police narratives and Garza's recorded interview with Detective Cantu. Based on her

interpretation of the data available to her, Dr. Cantu diagnosed Garza with depressive disorder and alcohol use disorder.

In evaluating Garza's risk of reoffending, Dr. Cantu noted that she gave him a score of "zero" for eight of the ten variables scored. For Garza's age at the time of the offense, Dr. Cantu assigned him a score of negative one on a scale of plus one to negative three because, according to Dr. Cantu, people who are "a little bit older" pose statistically less of a risk than younger offenders. For the variable relating to prior cohabitation with a partner, Dr. Cantu assigned Garza a score of plus one because he had not lived in a long-term relationship with a romantic partner. Dr. Cantu explained that people who have "stable, long-term relationships generally pose less of a risk to sexually reoffend than people who don't have that history." For that reason, Dr. Cantu considered Garza's risk to be elevated.

As for the variables that Dr. Cantu scored as a zero, she noted that Garza had no recorded history of convictions for sexual or non-sexual violence or for non-contact sex offenses, such as exhibitionism, and that the offense in question was not followed by another violent assault. Overall, Dr. Cantu considered Garza to have a score of zero, which fell in the below average risk category for sexual reoffending according to the Static-99R. Dr. Cantu testified, however, that the best practice is to use the Static-99R in conjunction with another tool that measures dynamic factors,

13

so she also used the SOTIPS evaluation. According to SOTIPS, Garza scored an eleven, which score fell on the low end of the moderate range of scores from eleven to twenty. Dr. Cantu explained that a score in the moderate range indicates that the subject has risk factors that will need to be addressed in therapy to lower the risk. Those factors include Garza's sexual offense responsibility and his sexual attitudes and risk management.

More specifically, Dr. Cantu stated that regarding accepting responsibility, Garza partially blamed his alcohol consumption for his conduct. Dr. Cantu further testified that Garza described Kylie "in a way that could be congruent with victim blaming[,]" thus indicating providing insight into his sexual attitudes. In addition, Dr. Cantu noted that Garza did not "have a full awareness of understanding how to manage his risk in the community moving forward." In her opinion, that awareness typically "only comes with being a participant in a group program that teaches specific skills that are designed to monitor risk and reduce risk."

When asked about other risk evaluation criteria, Dr. Cantu responded that Garza scored a zero for criminal and rule breaking behavior and attitudes. She based this score on Garza's lack of new charges during the six-month time frame preceding her evaluation and on his lack of attitudes or behavior consistent with the belief that one must harm others in order to succeed. Proceeding to Garza's willingness to make

changes, Dr. Cantu rated Garza a one. Garza told Dr. Cantu that he was willing to take classes to understand his risk, but did not initially believe that he needed more than "a couple of classes[;]" he later told her, however, that he was willing to do "quite a bit more therapy[]" to address this "very big problem." On a scale of zero to three, Dr. Cantu rated Garza a one for this variable. Dr. Cantu also assigned Garza a one for his cooperation with initial evaluation because although he cooperated with her assessment, he was "defensive and wasn't always forthcoming."

Dr. Cantu also discussed the sixteen treatment, intervention, and progress skill items to be assessed in light of Garza's need for them. These items are scored on a scale from zero to three, and Dr. Cantu scored Garza as needing either some intervention or moderate improvement on many of these items; she did not rate Garza as having a high or considerable need for improvement as to any items.

Dr. Cantu rated Garza's overall risk by combining the results of the Static-99R and SOTIPS evaluations. She accordingly placed Garza "in a lower risk category relative to other individuals [convicted] of sex crimes." She did, however, advise that Garza's MMPI scores should be interpreted cautiously, since they could underrepresent his traits.

Based on the evidence available to her, Dr. Cantu "strongly encourage[d]" Garza to obtain treatment "specific to his sexual offending behavior" to ensure that

15

he understood the gravity of his conduct, its impact on Kylie and others, and his risk for reoffending. Most of these specific treatment programs "strongly encourage men and women who have a conviction, to move closer to full responsibility for the offense." The programs "focus a lot on thinking[]" by asking the offender what he was thinking at the time of the offense and what "thoughts and feelings might have contributed to that pattern of behavior?" There are, however, no guarantees that a treatment program will succeed in preventing future offenses.

When expressly asked about Garza's likelihood of success if he were sentenced to probation, she referenced "several protective factors" that would "bolster the chances [Garza] can make the right choices in the community." These "protective factors" include Garza's "relatively stable job history[;]" his stable home outside a child safety zone; his "adequate intelligence and job skills[,]" and his social and family support.

During cross-examination, Dr. Cantu agreed that before committing the offense charged, Garza would have been considered low risk. She further confirmed that repeat offenders may have been considered low risk after committing their first offense, but that other variables also would be considered in making the risk assessment.

**Garza's Character Witnesses' Testimony**

Antonio Santos, Dominic Rodriguez, "Yolanda," Asalea Garza, and Robert Rodriguez testified to their experiences with Garza.[3,4] As a whole, they testified that they had known him for several years, believed him to be a kind and generous person, and were surprised to hear that he had committed the offense in question.

## G. Documentary Evidence

The record contains the following exhibits:

- Pre-Sentence Investigation Report

- Admonitions to the Defendant for Plea to the Court

- Indictment

- Deputy's Report for Incident 20A266526

- Biology Laboratory Report – September 28, 2020

- Garza's Driver Record Information

- Photographs of Scene

- Dr. Cantu's Curriculum Vitae

- Dr. Cantu's Psychosexual Evaluation of Garza

---

[3] As with Kylie, we refer to "Yolanda" by a pseudonym to protect her privacy as a survivor of sexual assault. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

[4] The record does not indicate that Asalea Garza is related to Appellant.

17

All exhibits were admitted without objection and support the testimony.

## II. Standard of Review[5]

Although Garza does not expressly invoke either the due process clause of the Fourteenth Amendment to the United States Constitution or the due course of law clause of the Texas Constitution, he argues that he was denied "a fair judicial process[,]" thus implicating these rights. *See* U.S. CONST. amend. XIV; Tex. Const. art. I, § 19; *see also Ex parte Lewis*, 688 S.W.3d 351, 351 (Tex. Crim. App. 2024) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955) ("'A fair trial in a fair tribunal is a basic requirement of due process.'")). We therefore review Garza's appeal under the standard applicable to complaints of a due process or a due course of law violation.

We review a complaint of a due process or due course of law violation under the same standard: a de novo review. *See Cabrera v. State*, 513 S.W.3d 35, 38 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) ("In applying our state constitutional

---

[5]It is unclear from Garza's brief whether he is asserting that he was denied due process of law, that he did not plead guilty voluntarily, or a different error by the trial court. Since Garza references "fundamental unfairness," we interpret his appeal as a due process complaint. *See* U.S. CONST. amend. XIV. It is unclear from his brief if he also claims that without this articulated consideration, the plea cannot be voluntary. It is Appellant's duty to present a "succinct, clear, and accurate statement of the arguments" he is making. *See* Tex. R. App. P. 38.1(h). Absent this, to the extent he attempts to raise a voluntariness complaint, we do not address it. *See id.*

guarantee of due course of law, we follow contemporary federal due process interpretations.") (citing *U.S. Gov't v. Marks*, 949 S.W.2d 320, 326 (Tex. 1997) (other citation omitted)); *see also Nicholson v. State*, 682 S.W.3d 238, 241 (Tex. Crim. App. 2024) ("We review questions of law de novo.").

If we construed Garza's appeal as an attack on the sentence, itself, rather than an attack on the procedure for imposing it, we would review his sentence, if at all, under a "gross disproportionality" standard. *See Jarvis v. State*, 315 S.W.3d 158, 162 (Tex. App.—Beaumont 2010, no pet.) (citing *Ex parte Chavez,* 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006) ("Subject only to a very limited, 'exceedingly rare,' and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal.") (other citation omitted)).

### III. Applicable Law

"[P]lea bargaining is the process by which the defendant in a criminal case relinquishes his right to go to trial in exchange for a reduction in charge and/or sentence." *Perkins v. Ct. of Appeals for Third Sup. Jud. Dist.*, 738 S.W.2d 276, 282 (Tex. Crim. App. 1987) (citations omitted). A criminal defendant does not have a constitutional or statutory right to a plea bargain. *See id*. In an open plea, conversely,

a "defendant pleads guilty without an agreement about the precise punishment he will receive[.]" *Harper v. State*, 567 S.W.3d 450, 454 (Tex. App.—Fort Worth 2019, no pet.).

To satisfy constitutional due process requirements, a guilty plea must be made voluntarily, with sufficient awareness of the consequences of the plea. *See* U.S. CONST. amend. XIV; *Ex parte Palmberg*, 491 S.W.3d 804, 807 (Tex. Crim. App. 2016); *see also Ex parte Arjona*, 402 S.W.3d 312, 314 (Tex. App.—Beaumont 2013, no pet.) ("Due process requires that a guilty plea be considered valid only if the plea represents a voluntary and knowing choice among the alternative courses of action available to the defendant."). "But a defendant need not have a comprehensive awareness of the specific impact that relinquishing his constitutional rights may have; sufficient awareness does not require complete knowledge of the prosecution's case." *Palmberg*, 491 S.W.3d at 807.

To assure the voluntariness of a defendant's plea and his awareness of its consequences, the Code of Criminal Procedure dictates the procedures to follow in accepting a guilty plea. *See* Tex. Code Crim. Proc. Ann. art. 26.13; *see also VanNortrick v. State*, 227 S.W.3d 706, 708 (Tex. Crim. App. 2007) (explaining that the purpose of the Article 26.13 admonitions ensures that the defendant's guilty plea comports with due process, but those admonitions themselves are not

20

constitutionally required). These procedures include admonishing the defendant, either orally or in writing, of the range of punishment, the requirement to register as a sex offender, and the requirement that the trial court assure itself "that the defendant is mentally competent and the plea is free and voluntary." *See* Tex. Code Crim. Proc. Ann. art. 26.13(a), (b).

Neither the voluntary and knowing requirement of due process nor the statutory sentencing procedure requires the trial court to set forth the basis of its sentencing decision. *See Palmberg*, 491 S.W.3d at 807 (referencing a voluntary and intelligent choice, but not the basis of the trial court's sentencing decision); *see also* Tex. Code Crim. Proc. Ann. art. 26.13(a), (b) (not including the trial court's reasoning for its sentencing decision). The Federal Sentencing Guidelines likewise impose no such duty on Texas courts, as their application is limited to the federal court system. *See Harper v. State*, 930 S.W.2d 625, 632 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (declining a request to instruct the jury regarding these guidelines).

Absent certain exceptions, the rules of error preservation apply to complaints that a defendant was denied a fair trial. *See Marin v. State*, 851 S.W.2d 275, 278–79 (Tex. Crim. App. 1993) overruled on other grounds by *Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997) (discussing preservation of error versus fundamental

rights); *see also Hogue v. State*, 629 S.W.3d 731, 734 (Tex. App.—Beaumont 2021, no pet.) (referencing the alleged violation of the defendant's right to an impartial jury). These exceptions encompass the right to counsel and to a jury trial, which must be expressly waived to be relinquished. *See Marin*, 851 S.W.3d at 278–79.

## IV. Analysis

On appeal, Garza urges us to recognize a constitutional right to have the trial court grant him consideration for his guilty plea and articulate the details of that consideration on the record as part of his right "to a fair judicial process." Garza bases this argument on public policy and on the Federal Sentencing Guidelines, yet he has cited no controlling authority applying these considerations to this case. *See* Tex. R. App. P. 38.1(i) (requiring briefs to contain "appropriate citations to authorities and to the record[]"). To the contrary, Garza's public policy arguments about noting that plea bargains prevent the "already backlogged courts" from "implod[ing]" "should be addressed to the legislature" rather than the court system. *See Zwack v. State*, 757 S.W.2d 66, 69 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd); *see also Longmire v. State*, 171 S.W. 1165, 1174 (Tex. Crim. App. 1914) ("The wisdom of the policy adopted by the state, as expressed in its laws, and the desirability of another and different policy are matters addressed to the legislative branch of the government[.]"); *Mitchell v. State*, 821 S.W.2d 420, 423 (Tex. App.—

22

Austin 1991, pet. ref'd) (explaining the context of interpreting a DWI statute that "[t]he State's policy arguments must be addressed to the legislature"). As for Garza's argument that his cooperation should reduce his sentence, as provided in the federal court system, the Federal Sentencing Guidelines do not apply in this state criminal case. *See Harper*, 930 S.W.3d at 632. Regardless, a sentence within the legislatively prescribed range generally will be affirmed on appeal. *See Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984) (noting "that as long as a sentence is within the proper range of punishment it will not be disturbed on appeal[]"); *Diamond v. State*, 419 S.W.3d 435, 440 (Tex. App.—Beaumont 2012, no pet.) (declining to hold that a ninety-nine-year sentence for a first-degree felony was either disproportionate to the offense or was unconstitutionally cruel and unusual). The trial court sentenced Garza to ten years, half the maximum sentence allowed by statute. *See* Tex. Penal Code Ann. § 12.33(a) (permitting a twenty-year sentence upon conviction of a second-degree felony). Based on Garza's ten-year sentence, it is possible the trial court considered Garza's cooperation as a mitigating factor in his sentence. The record from the sentencing hearing also shows that the trial court noted Garza's victim-blaming and using alcohol as an excuse, which it could have considered as aggravating factors in assessing Garza's punishment.

In addition, Garza's appeal references the plea bargain process and its importance to the judicial system. While we agree that plea bargaining contributes to judicial efficiency, we note that Garza's guilty plea did not result from plea bargaining; instead, Garza entered an open plea, with no sentencing agreement from the State. *Compare Perkins*, 738 S.W.2d at 282 (defining a plea bargain), *with Harper*, 567 S.W.3d at 454 (explaining an open plea and the difference between a charge bargain and a sentence bargain); *see also Ex parte Broadway*, 301 S.W.3d 694, 696 (Tex. Crim. App. 2009) (contrasting a plea bargain with an open plea).

Assuming without deciding that Garza had the right to such consideration and explanation from the trial court, he failed to preserve error on this point. *See id*. 33.1(a); *see also Diamond*, 419 S.W.3d at 440 (dictating the requirements to preserve error to an alleged disproportionate or cruel and unusual sentence). To preserve error, Garza needed to timely object to his sentencing procedure and obtain a ruling on his objection. *See Diamond,* 419 S.W.3d at 440. He did not do so. Garza therefore failed to preserve his argument for appellate review. *See Kim v. State*, 283 S.W.3d 473, 475 (Tex. App—Fort Worth 2009, pet. ref'd).

Here, as in *Kim*, the defendant entered an open plea as opposed to a bargained plea, and the trial court sentenced him to a prison term rather than the community supervision he sought. *See id*. at 474–75. Kim, like Garza, did not object. *See id*. On

appeal, our sister court affirmed Kim's sentence, holding that Kim's failure to object preserved nothing for review. *See id*. at 475.

Although Kim appealed the length of his sentence rather than the trial court's procedure, we are persuaded by the *Kim* court's reasoning that an objection is required to preserve error as to sentencing. *See id*.

In his briefs, Garza rhetorically asks what incentive he had for pleading guilty. In response, we note that an incentive need not take the form of a reduced sentence. Sparing Kylie and the rest of the family the emotional trauma of a trial would be an incentive, as would sparing his family the embarrassment of a public trial. *See Whitaker v. State*, 286 S.W.3d 355, 359, 361 (Tex. Crim. App. 2009) (referencing the defendant's willingness to plead guilty to spare his family "the ordeal of a trial.").

We overrule Garza's sole point of error on appeal.

## V. Conclusion

Having considered and rejected Garza's sole appellate point, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON<br>
Chief Justice

Submitted on June 26, 2024
Opinion Delivered February 12, 2025
Do Not Publish
Before Golemon, C.J., Johnson and Wright, JJ.